[L. A. No. 12592. In Bank.—April 2, 1935.]

F. A. LEAVITT et al., Respondents, v. GRACE INA GIBSON et al., Executrices, etc., Appellants.

Frederick M. Kincaid, Anderson & Anderson & Sheahan, Anderson & Anderson, W. H. Anderson, Haight, Trippet & Syvertson, and Arthur L. Syvertson, for Appellants.

Lyle Pendegast, R. M. Wiley, J. K. Wilson and J. C. Landry for Respondents.

THE COURT.—The opinion prepared by Presiding Justice Conrey, District Court of Appeal, Second Appellate District, Division One, and adopted by that court when the above-entitled cause was before it for hearing and decision, is hereby adopted by this court as its decision in said cause, together with the authorities and observations added thereto by this court. It follows:

"In March, 1927, and for a long time prior thereto, the plaintiffs were the owners of a parcel of real property on Fair Oaks avenue in the city of Pasadena, said property being of the fair and reasonable market value of $42,000. The transaction out of which the controversy herein arose consisted of a conveyance of said Fair Oaks property by the plaintiffs to one Phil D. Rice, the consideration therefor being the sum of $10,000, together with assignment and transfer to plaintiffs of a note of $32,000 made to Rice by one John L. Hittson, secured by a second trust deed on certain property situate in Riverside County, and known in this record as the Granite Hill ranch. Soon after the above-mentioned transaction was closed, the property was sold to defendant Frederick M. Kincaid, by the trustee of the first trust deed, to pay the note secured thereby, which was a note of $40,000 made by Rice together with the said first trust deed, before the Granite Hill ranch was conveyed by Rice to Hittson. Prior to the sale by the trustee, Gibson had transferred the $40,000 note to Kincaid. In this action the court found, upon sufficient evidence, that the value of said ranch property was less than the sum of $40,000. This fact, together with the fact that Hittson was financially irresponsible, made the $32,000 note worthless. The net result was that the plaintiffs, for their Fair Oaks property, worth $42,000, received nothing of value except the sum of $7,000, which remained of the said $10,000 after payment of about $3,000

in expenses of the sale, incurred by the plaintiffs, which expenses included a commission of $2,000 paid to the defendant George Burnham.

"On or about the 31st day of March, 1927, the deed of conveyance of the Fair Oaks property by plaintiffs to Rice was delivered out of escrow, and the other elements of the transaction were completed. On April 17, 1928, the plaintiffs commenced this action, as an action to recover damages for 'fraud and deceit', alleged to have been practiced upon them by the defendants, whereby the plaintiffs were induced to accept said $32,000 note and second trust deed as part of the consideration for the transfer of their property. Upon issues presented by the pleadings, the case went to trial, beginning on December 12, 1928. On January 21, 1929, the parties had rested after presenting their evidence. Thereupon an agreement was made for argument by means of briefs, and the following order was made by the court and entered in the minutes: 'Cause to stand submitted on presentation of closing brief, fifteen, ten and fifteen days allowed. Plaintiffs to open.' (Concerning orders of this kind, see *Franks* v. *Cesena*, 192 Cal. 1, at p. 3 [218 Pac. 437].) These time limits were exceeded, in fact, on both sides. On May 1, 1929, a time when the reply brief of plaintiffs had not yet been served or filed, defendant John W. Gibson died Thereafter, prior to July 17, 1929, his will was admitted to probate. Grace Ina Gibson and Thelma Gibson were appointed executrices of the will. In due course the plaintiffs herein filed as a claim against the estate their demand, covering the subject of this action. Said claim failing of approval, the plaintiffs then gave notice of motion, in this action, for an order substituting the executrices as defendants in place of John W. Gibson, and for leave to proceed by 'amended and supplemental complaint', etc. On July 24, 1929, said motion was presented, and was granted. An 'amended and supplemental complaint' was filed. In this pleading the plaintiffs, by reference, realleged the matters contained in their former pleadings, and set forth supplementally the fact of Mr. Gibson's death and the subsequent proceedings in relation thereto. An answer having been filed, the case was again brought on for trial, on the 30th day of July, 1929, pursuant to notice duly given. The defendants, however, did not then appear. The court in its

order of July 24th had provided that on July 30th 'the said cause shall be reopened for the sole purpose of receiving evidence concerning the death of Gibson and the said supplemental proceedings'. At the hearing on July 30th that evidence was received, and no evidence was offered or received as to any of the issues made by the original pleadings. On July 24, 1929, the attorneys for the plaintiff delivered to the court a brief which (says the bill of exceptions) 'was and is the closing brief referred to in that portion of said order of January 21, 1929, which reads as follows: ''Cause to stand submitted on presentation of closing brief'' '.

''On November 8, 1929, the court filed its findings of fact and conclusions of law, directing judgment in favor of the plaintiffs. Paragraph four of the conclusions of law states: 'In view of the circumstances of this particular case, justice requires that this decision, these findings of fact and conclusions be filed *nunc pro tunc* as of date January 22, 1929, the day following the time the taking of evidence was concluded.' Accordingly the decision was filed '*nunc pro tunc* as of January 22, 1929'. Nevertheless, the findings themselves do include the proceedings to which we have referred, arising out of the death of defendant Gibson. Pursuant to the findings thus made and the court's conclusions thereon, judgment was entered in favor of the plaintiffs and against defendants John W. Gibson, Frederick M. Kincaid and Zeddy Barker, as well as against other defendants who have not appealed, for damages in the sum of $35,000, together with the sum of $25,000 as exemplary damages. The said total sum of $60,000 was 'established and allowed' against the estate of Gibson in accordance with the supplemental complaint. Judgment was entered November 9, 1929.

''There are two notices of appeal, one being by the executrices of the will of Gibson and by Kincaid and Barker, and being an appeal from the judgment, and the other is an appeal by said executrices from an order entered by the court on January 7, 1930, denying a motion of the defendant executrices whereby they asked the court to vacate and set aside the judgment rendered in said action against the said John W. Gibson, deceased.

''In order to understand the situation existing at the time when plaintiff parted with their Fair Oaks property for the

considerations hereinabove stated, it is necessary to have in mind certain recent earlier history of the Granite Hill ranch. In September, 1925, that property was owned by E. Van Wickle; subject, however, to an $18,400 mortgage in favor of the First Trust & Savings Bank of Pasadena and F. H. Gilcrist, and also subject to a trust deed (junior to the mortgage) securing $31,500 in notes payable to the order of Herbert A. Stokes and wife. The $31,500 note was sold and transferred to defendant Gibson. Default having been made on this note the property was sold to defendant Barker for $1,200. It is admitted that in this purchase and in the subsequent transfer by Barker to Rice, defendant Barker was acting as agent for Gibson. The record thus shows that in March, 1927, the record title to the Granite Hill ranch stood in the name of Barker (the real owner being Gibson), and was subject to the $18,400 mortgage. The subsequent transfers and incumbrances were completed through several concurrent and interlocking escrows. By escrow No. 6893 at First Trust & Savings Bank of Pasadena, on or about February 3, 1927, the Van Wickle notes and mortgage were deposited in the bank, together with satisfactions thereof to be used on payment of the two notes, amounting to the principal sum of $18,400. Under the same escrow number, Gibson deposited with the bank on February 1, 1927, his 'seller's escrow instructions' offering to sell the ranch to Phil D. Rice, upon stated conditions which provided for the deposit by Rice of the sum of $19,600 to be used in payment of the mortgage and for payment of stated expenses; and further provided for a note of $40,000 to be executed by Rice in favor of Gibson and secured by trust deed on the ranch. Gibson also agreed to deposit for use in the transaction a deed by Barker and wife to Phil D. Rice, a single man. Instructions concurrent with those of Gibson were signed by the Barkers On the same day an acceptance of the Gibson offer was signed by Rice, wherein he stated that he would hand to the bank a check for $19,600 together with expense funds and the $40,000 note and trust deed. Subsequently the Barker conveyance to Rice and the said notes and trust deed were in fact deposited with the escrow holder.

"In escrow No. 6921 at the same bank, on February 8, 1927, instructions were deposited by Phil D. Rice as purchaser, and Hittson as vendor, for the sale of a one-half

section of land in Culberson county, Texas, conveyance to be made concurrently with a conveyance of the Granite Hill ranch by Rice to Hittson; it being further agreed as part of the consideration from Hittson to Rice that Hittson would execute and deliver his note for $32,000 secured by trust deed on said Granite Hill ranch. Stating the matter another way, it may be said that by virtue of these escrow instructions Rice was agreeing to convey to Hittson the Granite Hill ranch subject to the $40,000 note and trust deed in favor of Gibson, on receiving from Hittson a deed to the Texas land and the $32,000 note and trust deed.

"Through escrow 52–998 (Pacific Southwest Trust & Savings Bank) the deed from the plaintiffs to Rice was delivered when the escrow agent received for the plaintiffs the sum of $10,000 and the said second trust deed and $32,000 note, assigned to the plaintiffs. It will be noted that in the completion of these transfers, trust deeds, mortgage release, assignments of notes, etc., Rice was to pay off the $18,400 mortgage, and was to pay $10,000 to the plaintiffs. In fact, he paid nothing. According to the testimony of Newby and Gibson, Rice was a tourist, from an eastern state, and he left this state before the escrows herein mentioned were closed. The record does not show anything definite about the financial status of Rice. The court was justified in concluding, from all the circumstances, that Rice loaned the use of his name in these transactions, to accommodate Newby, or Newby and Gibson, and for no other purpose. Gibson, acting through Barker, paid into escrow 6893 the $19,600 which under the terms of that escrow would have been paid by Rice. In contemplation of this arrangement, Rice, by his attorney in fact Newby, executed to Barker a deed conveying the Fair Oaks property. This deed, bearing date March 18, 1927, was recorded on March 31, 1927, following the recording of the deed of same date by the plaintiffs to Rice. Concurrently, a $10,000 first mortgage loan was obtained from the First Trust & Savings Bank of Pasadena, secured on the Fair Oaks property. This mortgage, executed by Barker and wife on March 23, 1927, was recorded March 31st, when the prior deeds had placed the record title in Barker's name. By these several steps Gibson, in the name of Barker, became the owner of the property of the plain-

tiffs, and the plaintiffs were paid $10,000 raised by mortgage on their own property (less $3,000 commissions, etc.), and received nothing else except the $32,000 note and second trust deed on the Granite Hill ranch, subject to Gibson's $40,000 first trust deed against that property. The close of these escrows left Hittson as the record owner of the ranch, for which he paid nothing except that he conveyed to Rice the Texas land and executed to Rice the $32,000 note and second trust deed on the Granite Hill ranch. Hittson testified that the Texas land at that time was worth 'approximately a dollar an acre'; and that the total value of his assets at that time was less than $1,000.

"In general effect the fraud and deceit which the plaintiffs claim was practiced upon them by the defendants may be described as follows: that defendant Gibson first acquired the Stokes notes which were secured by trust deed on the Granite Hill ranch, subject to the prior mortgage securing an indebtedness of $18,400; that thereafter by a series of conveyances and trust deeds and manipulations thereof, a fictitious valuation of $120,000 was built up on said ranch, whereby the $32,000 note might be made to appear well secured, whereas, in fact, it was without value; and that all of this was done through irresponsible persons acting as 'dummies' for Gibson. It is the claim of the plaintiffs that the defendants having first laid this false foundation for a successful fraud, thereafter made the false representations upon which the plaintiffs relied and whereby they lost the Fair Oaks property. The alleged false representations are numerous and may be found in the record. Among the salient statements of fact contained in the alleged false representations made to the plaintiffs are these: that the Granite Hill ranch had recently been sold for $120,000, that is for $48,000 in cash, together with a first mortgage for $40,000 and said trust deed for $32,000, whereas, in fact, neither said sum of $48,000 nor any part thereof had been paid by any purchaser of said property and said $40,000 trust deed and note had been delivered without consideration; also, that it was represented to the plaintiffs that Hittson, the purchaser and present owner of the ranch, was a millionaire, personally well able to pay all of said indebtedness, whereas in fact, Hittson was financially irresponsible.

"The complaint alleges the existence of a conspiracy entered into among the defendants, pursuant to which the various misrepresentations and other wrongful acts by the defendants were accomplished whereby the plaintiffs were deprived of their property. The proof of conspiracy in which the appellants were cooperating parties was especially important because the direct evidence of misrepresentations made by either one of appellants is of slight weight as compared with the similar direct testimony concerning representations made by defendants Burnham and Newby. Under such circumstances it is only by establishing a conspiracy between these parties that the plaintiff could obtain the benefit of the rule whereby misrepresentation made by one conspirator is chargeable against the other conspirators although not made directly by them. Thus, for example, the testimony of the plaintiffs, concerning false representations made to them by the defendants Newby and Burnham, is very much more definite in its particulars than is any of their testimony involving Gibson in the making of such misrepresentations. It is only by proof of circumstances tending to show that these several defendants had conspired, and were acting together as alleged in the complaint, that appellants could be held responsible for the wrongful acts of their said codefendants.

"Defendant Burnham was a real estate agent in Pasadena. Frederick A. Leavitt, one of the plaintiffs, testified that in January, 1927, he met Burnham and told Burnham that he and his brother owned said Fair Oaks property and wanted to sell it at the price of $45,000. Early in February Burnham told this witness that Mr. Newby had a trust deed of $32,000, secured by the Granite Hill ranch; that the ranch had recently been sold for $120,000, cash $48,000, and there was a $40,000 mortgage on it, and then this $32,000 trust deed he considered just as good as money or even better. At a later conversation Burnham repeated these statements about a sale of the ranch for $120,000, and stated that two bank appraisals on the ranch had been made, one giving a valuation of $97,000 and the other $95,000. Thereafter this witness, together with Newby and Burnham, made a trip to Riverside county, where they visited the Granite Hill ranch. The three men drove together in an automobile from Pasadena. In their conversation Newby

claimed that he and a partner had owned the ranch for two years, and that they had sold it to Hittson for $120,000, $48,000 cash, $40,000 mortgage, and this $32,000 trust deed. He repeated the above-mentioned statement about bank appraisals; and there were various other statements concerning water supply, pumping plant, a granite hill of great value for quarrying purposes and for which a $35,000 offer had been made. Concerning Mr. Hittson, Newby said that Hittson was a millionaire and well able to take care of all his paper; that Hittson had just bought the ranch and was coming there to subdivide it to pass away the time.

''Concerning defendant Gibson this witness, F. A. Leavitt, testified that he met Gibson the next afternoon after the trip to the ranch. Mr. Burnham took the witness to Gibson's home. 'Mr. Burnham introduced me to Mr. Gibson and said I wanted to see him in regard to a trust deed that we were thinking of trading for secured by the Granite Hill ranch in Riverside, that he understood he held the first mortgage on the ranch. Mr. Gibson said he held the first mortgage and that he had put in the greater part of two or three days down to the ranch investigating before he took the mortgage. He found there was two bank appraisals on the ranch by the Riverside Bank, one for $95,000 and one for $97,000. He says there is practically 60 acres of lemon orchard in good condition. He spoke of the water supply and their own pumping plant that cost $20,000, about the subdivision, and that Granite Hill ranch, and he had satisfied himself that the lemon orchard would take care of his mortgage, and that left the balance of the ranch free. I asked him if he was acquainted with this Hittson that had bought the ranch, and he said that when he took the mortgage he loaned him the money, and Mr. Hittson asked the privilege of paying it on that mortgage as he wanted to subdivide some of it and sell it out in chicken ranches and wanted it released and Mr. Gibson granted him that privilege. Mr. Gibson stated at that time he understood there was a second trust deed, but he had never seen it and could not say for certainty about it, but if there was it made the first all the more secure. Burnham, he says, ''This looks awfully good to me. It looks as if this paper is awfully good.'' And Gibson, he said it was well secured and the ranch was well worth the property and he considered the paper perfectly safe.'

■ "Without going into further details of the evidence, and without any special description of the later transactions in the course of which the defendants disposed of the Fair Oaks property, suffice it to say that we conclude therefrom that the findings are sustained by the evidence. The findings themselves unnecessarily include many evidentiary items which might better have been omitted, but these may be disregarded without affecting the merits of the case. And the findings support the judgment.

■ "It is claimed by appellants that the court erred in admitting evidence of the above-mentioned transactions which were subsequent to those which ended with the closing of the escrows on March 31, 1927, not only because they occurred after the transfer of plaintiffs' property had been completed, but also because there is no evidence of any conspiracy in which appellants were connected as coconspirators. But we think that the evidence is sufficient to prove that appellants were parties to the conspiracy. And as to the fact that the evidence related to transactions subsequent to March 31, 1927, appellants have failed to support their contention by reference to any authorities pertinent to that subject. There are decisions referred to by respondents, which have some persuasive force. (*Exchange Bank* v. *Moss,* 149 Fed. 340; opinion by Circuit Court of Appeals, 8th Circuit.) But without deciding this question, at all events we are convinced that even if this merely cumulative evidence should have been excluded, the other evidence is so convincing that the error, if any, was not prejudicial, and did not contribute to any miscarriage of justice.

■ "In our statement of the case we have referred to the death of Mr. Gibson, and the subsequent proceedings which culminated in the entry of judgment. In support of their appeal from the judgment, as well as from the order denying their motion to vacate the judgment, appellants contend that by reason of the death of Gibson at a time when the plaintiffs had not yet served or presented to the court the final brief provided for in the order of January 21, 1929, the trial court was without any 'right, power, authority or jurisdiction' to render, at the date of the rendition of said judgment, any judgment whatever, *nunc pro tunc* or otherwise, against the said John W. Gibson, deceased. It

was upon this ground that appellants made their motion, which the court denied.

"On May 1, 1929, the date of Gibson's death, the reply brief of the plaintiffs had not yet been served on the defendants or delivered to the judge, and the cause had not been submitted to the court for decision. In all other respects it was ready for submission. On July 24, 1929, pursuant to notice given, the plaintiffs presented a motion in which they requested, among other things, that 'the order heretofore made submitting said cause for decision' be set aside and the case reopened for the sole purpose of making the specified supplemental proof. On the same day they served, and gave to the judge, their final brief.

"This motion was granted, and the case set for further trial on July 30, 1929, and the 'amended and supplemental complaint' was filed, to which the executrices and Kincaid filed their answer on July 25th. The 'amended and supplemental complaint' consisted wholly of supplemental matters except that it did 'here repeat and reallege' the former pleadings of the plaintiff, without in fact setting them forth other than by this reference thereto. At the hearing on July 30th the additional evidence contemplated by the prior order was received, and the minutes of the hearing close with this statement: 'Cause re-submitted.'

"Since there had been no prior submission, this order of July 30th could not be a resubmission. But it did constitute a submission of the cause, unless it can be successfully maintained that on the record thus made the court was without power to submit and under such submission thereafter to decide the case. We think that the court did have that power.

"But appellants particularly contend that the court did not have the right to file its decision *nunc pro tunc* as of a date prior to the death of Gibson. In support of this contention they emphasize the fact that at the time of Gibson's death the cause was not actually under submission. So far as the supplemental proceedings are concerned, covering the death of Gibson and the completion of the record in connection with that fact, it is plain that *nunc pro tunc* findings dated back to January would be an absurdity. But in this we find no insuperable objection. For if in fact justice required it, the findings upon the main issues, which were

tried during the lifetime of Gibson, might be considered as entitled to be filed *nunc pro tunc* as of the January date, although the findings covering the supplemental proceedings must be considered as of the actual date in November, 1929.

"In support of their contention that in this case an order for the entry of the decision *nunc pro tunc* could not legally be made, appellants refer to 14 California Jurisprudence, pages 931–933; 15 Ruling Case Law, pages 626–627, and 34 Corpus Juris, page 74, and to a number of the decisions therein cited. Some of these decisions directly declare that to entitle a party to have its judgment entered *nunc pro tunc* on account of the death of one of the parties the action at the time of such death must have been ready for the rendition of final judgment. The rule is traced back to the practice in very ancient English cases and early American cases.

"It appears, however, that the more modern practice, including that of California, has resulted in some modification of the rule. In *Estate of Pillsbury,* 175 Cal. 454, 462 [166 Pac. 11, 3 A. L. R. 1396], in the course of an extended discussion of the subject of entry of judgments *nunc pro tunc,* the Supreme Court said: 'So it will be found without citing specific instances that the trend of legislation is to broaden even the common-law rule and to provide that the right of action shall survive in cases *ex delicto* if the defendant has appeared or has been served with process, while a brief consideration of the adjudged cases will show that nowhere is the principle enunciated denied application because the action is in tort.' ▪ We do not lose sight of the fact that the case at bar is not in the complete sense an action *ex delicto,* such as an action to recover damages for personal injury. This is an action to recover damages for a wrong committed by fraudulent means in the course of a business transaction. The right of action in this case would survive the death of the defendant Gibson; but perhaps it would not survive to an extent which would justify that part of the judgment which granted exemplary damages. We have not examined into this question so as to form an opinion and it does not seem necessary so to do at this time. The case in its circumstances is quite sufficient to justify the broadening of the rule as mentioned by the Supreme Court in the foregoing quotation. The court in

that case refers with apparent approval to the case of *Fox* v. *Hale & Norcross S. M. Co.*, 108 Cal. 478 [41 Pac. 328], where the subject received careful attention. In that case at the date of the death of one of the defendants the case was under submission, and the judge had announced his conclusions and directed the preparation of findings and decree, but they had not yet been prepared at the date of the death of said defendant. Thereafter executors of his will were made parties defendant, and subsequent proceedings followed as in the present case, and findings and judgment were entered *nunc pro tunc* as of a date prior to the death of said defendant. █ Discussing the subject of *nunc pro tunc* judgments the court said: 'The authority of a court to order its judgment to be entered *nunc pro tunc* is inherent in the court, and is to be exercised for the purpose of doing justice between the parties. A court will always exercise this authority when it is apparent that the delay in rendering the judgment, or a failure to enter it after its rendition, is the result of some act or delay of the court, and is not owing to any fault of the party making the application. One class of the cases in which this authority may be exercised, says Mr. Freeman, comprises those ''actions in which no judgments have ever been rendered, but which are so far as the suitors can make them, in condition for the rendition of final judgments''. (Freeman on Judgments, sec. 57.) ''The rule established by the general concurrence of the American and English courts is that, where the delay in rendering a judgment or a decree arises from the act of the court—that is, where the delay has been caused either for its convenience, or by the multiplicity or press of business, through the intricacy of the questions involved, or of any other cause not attributable to the laches of the parties—the judgment or the decree may be entered retrospectively as of a time when it should or might have been entered up. In such cases, upon the maxim *Actus curiae neminem gravabit*—which has been well said to be founded in right and good sense, and to afford a safe and certain guide for the administration of justice—it is the duty of the court to see that the party shall not suffer by the delay. A *nunc pro tunc* order should be granted or refused as justice may require in view of the circumstances of the particular case.'' (*Mitchell* v. *Overman*, 103 U. S.

62 [26 L. Ed. 369]. See, also, *Blaisdell* v. *Harris*, 52 N. H. 191.) Whether the decision of the court is to be expressed in the form of findings of fact or in the form of a judgment, or both, is immaterial. The principle upon which its action is to be sustained is that justice may be done between the parties. If the cause has been tried and finally submitted to the court for its judgment, the rights of the parties are to be determined as they existed at the time of such submission, and neither party is to be prejudiced by the delay of the court in rendering its judgment. In *Campbell* v. *Mesier*, 4 Johns. Ch. (N. Y.) 342 [8 Am. Dec. 570], the cause had been submitted to the chancellor upon proofs taken before the master, and after argument, but before decision, one of the defendants died. The chancellor ordered the decree to have relation back, and to be entered as of the date when the cause was finally heard. If, as is provided by sections 632 and 633 of the Code of Civil Procedure, the making and filing of findings of fact is essential to its decision, the court has the same authority to order these findings to be filed *nunc pro tunc* as it has to order the judgment thereon to be so entered. These various acts —the making, as well as the filing of findings, and the entry of judgment—are only parts of the decision which the court has been invoked to make upon the submission of the cause, and together constitute the final determination of the rights of the parties. The decision which the parties have invoked the court to make is not necessarily the statutory and technical "decision" referred to in section 633 of the Code of Civil Procedure, but is the final determination of the rights of the parties, and includes every step or act of the courts which is requisite to a final judgment upon their rights. The rights of the parties are not to be prejudiced by the delay of the court in respect to any of these acts or proceedings, and the court is authorized to direct the making or filing of its findings of fact and conclusions of law, as well as the entry of a judgment thereon, *nunc pro tunc* as of such date as will preserve these rights.' The Supreme Court then referred to the provisions of section 669 of the Code of Civil Procedure under which the judgment entered after the death of a defendant is not a lien upon his real property, but is payable in the course of administration of his estate, and suggested that although it was appropriate to file the

findings of fact and conclusions of law as of a date prior to the death of the defendant, it was not necessary to so enter the judgment. The decision having been filed as of date prior to the death the judgment could be entered after the death. In the case at bar the practice thus suggested was followed, and the *nunc pro tunc* order was made with respect to the findings only and not the judgment.

"It must be conceded that the present case differs from the Fox case, *supra,* in that here the cause was not actually under submission at the date of the death of defendant Gibson. But he had been fully heard. All of the evidence had been received and both sides had rested. Both the brief for the plaintiffs and the reply of the defendants had been served and were in the hands of the judge. No reply had been presented by the plaintiffs, and the time allowed therefor had expired. On the day of Gibson's death the court was in a position to have ordered the case submitted although it had not actually made such order. The bill of exceptions does not show that any stipulation or order for extending time for such reply brief had been made. (Trans., pp. 716, 717.) In view of the facts thus shown by the record we have reached the conclusion that there is no substantial difference between the situation presented by this case with respect to the question now under consideration and that presented in the two California decisions to which we have referred. The delay which had occurred (at the time of Gibson's death) may well have been caused by 'the intricacy of the questions involved', as by any cause attributable to the laches of the parties. So, in relation to the right of the trial court to have its decision filed as of January 22, 1929, we think that such right should be upheld, and that 'the principle upon which its action is to be sustained is that justice may be done between the parties'."

In view of the large record in this case it would be quite impossible, keeping in mind a reasonable regard for a limitation upon the space which should be devoted to the questions discussed herein, to answer each one of the many assignments of error urged by appellants in their very full briefs. We are satisfied that the major questions and principles which are discussed embrace all of the material matters which vitally affect the issues involved, and that the case has been carefully considered and sufficiently covered by the

decision of the District Court of Appeal. ▓▓ We think the weight of reason and authority supports the proposition that there should be no abatement of the trial of causes in the case of the death of one of the parties to an action in cases where the evidence has been wholly concluded, and the only act left undone in the case is the filing of an overdue reply brief, which the plaintiff had reserved the right to file at the time leave was granted by the court to file briefs at the close of the actual trial. What prejudice the defendant could possibly have suffered by the failure of the plaintiff to file a reply brief to his answer can be answered by no other word than, ''None''. Every privilege which could in the ordinary cause of events inure to the benefit or advantage of the defendant had absolutely accrued before his demise.

The law does not favor such an abortive termination of the trial of causes as would result from declaring a mistrial for the reasons herein urged against the entry of a *nunc pro tunc* judgment. In addition to the authorities cited in the above opinion, may be added the case of *Citizens Securities & Investment Co.* v. *Dennis,* 236 Ill. App. 307, which is singularly similar to the instant case in all its essential features. It is an appellate case, it is true, but the proposition is treated in its general sense. The question there was whether the action abated by reason of the failure of plaintiff to file a closing brief. The death of the defendant occurred July 14, 1924. On June 3, 1924, counsel for plaintiff filed his brief; on June 30, 1924, counsel for defendant filed defendant's brief; on July 7, 1924, leave was granted to the plaintiff to file its reply brief on or before August 26, 1924; on July 25, 1924, eleven days after defendant's death, plaintiff filed his reply brief. The cause was then set on the oral argument calendar to be argued October 27, 1924. No oral argument was made by either party. The motion made by defendant for abatement was opposed by plaintiff, who contended that judgment *nunc pro tunc* as of July 14, 1924 ·(the day of defendant's death), should be entered. Discussing the rule that where one of the parties dies after appeal taken, a judgment *nunc pro tunc* may be entered as of a date prior to the death of the party provided the court had ·acquired jurisdiction and rightful authority to render a judgment on that date, said court holds the appellate rule

to be in substantial conformity with the general rule in regard to the power of a court to enter judgment *nunc pro tunc* in cases where the cause was in such condition at the date to which the judgment is to relate back that a final judgment could then have been entered immediately. (1 Black on Judgment, sec. 133, pp. 150, 151; 23 Cyc., p. 840; 34 C. J., sec. 209, p. 72.) The court restates the well-recognized principle of necessity in furtherance of justice and in order to save a party from unfair prejudice through delay caused by the act of the court or through the course of judicial procedure, upon which such judgments are sustained.

The argument was made in that case as in the instant case that the record was not in shape as would justify the entry of a *nunc pro tunc* judgment; that the practice of entering such judgments obtained only in cases where the death of one of the parties occurred after the cause had been heard and taken under advisement. The court repudiated the contention that a *nunc pro tunc* judgment might only be entered after the cause had been heard and taken under advisement, and declared that there was no authority supporting such a contention, and applied the test, as declared by Black, which is, was the cause in such condition at the date to which the judgment is to relate back that a final judgment could then have been entered? There can be no doubt in the instant case that a final judgment could have been entered at the close of the evidence and surely on the date that the plaintiff's time for filing the closing brief expired. Commenting upon the case of *Danforth* v. *Danforth,* 111 Ill. 236, wherein it was decided that the court had full jurisdiction and rightful authority to render the decision it did, the court concludes the discussion in the following language, which is applicable generally to the subject under consideration:

"Applying the principle contained in this language to the case at bar the question is whether this court 'was clothed, by the act of the parties and the law, with full jurisdiction and rightful authority to render' a judgment prior to the death of the defendant. The subject-matter of the cause was within the jurisdiction of the court, and the court acquired jurisdiction of the defendant before his death when he filed his brief. The filing of his brief by the defendant

was the equivalent of a joinder in error. (*Finlen* v. *Foster*, 211 Ill. App. 609, 620, 621.) In this state of the record this court had full power to have rendered a judgment before the death of the defendant, notwithstanding the fact that the reply brief of the plaintiff was due to be filed, on a date subsequent to the death of the defendant, and that the oral arguments were set for hearing on a date subsequent to the death of the defendant. The rules of court under which the reply brief of the plaintiff and the oral arguments on behalf of both the plaintiff and the defendant were permissible could have been disregarded by this court unless such action of the court would have been likely to result in injustice to the parties.'' (Authorities cited.)

Appellants seem to assume that the judgment in the instant case, because it includes exemplary damages, is not entitled to the judicial standing that it would have if it did not include such damages. The judgment in this case has the same sanctity in law as any other judgment obtained in a court of law or equity could have. The trial was had in accordance with the statutory and procedural law of the state. It is a judgment in a civil case entitled to every presumption which comes to the aid of judgments. Appellants assail it on the ground that it is punitive in character and being so the action does not survive the death of the wrongdoer. This contention is not tenable. The cause was in a condition in which a judgment authorized by law could have been entered and should have been entered against the defendants, both for compensatory damages and exemplary damages. The Civil Code, section 3294, in defining such damages, provides in language too simple and clear to require interpretation, that ''in addition to the actual damages [the plaintiff], may recover damages *for the sake* of example, and by way of punishing the defendant''. (Italics ours.) The object of the statute is plainly twofold. Such damages enter into and become a part of the judgment in a civil action. They are payable to the person wronged and when legally obtained they are governed by the same rule as governs a judgment in any other kind of civil action. There is no reason why a different rule should be formulated in such cases, than there would be for a different rule. in cases of tort, or a simple action upon contract.

The judgment and the order are, and each of them hereby is, affirmed.

THOMPSON, J., Dissenting.—I dissent. I entertain no doubt concerning the power of the trial court to enter a judgment *nunc pro tunc* in so far as it provides for compensatory damages, but it must be remembered that exemplary damages are imposed for the purpose of punishment. In 8 California Jurisprudence, section 106, it is said: "Punitive damages have no compensatory character. They amount only to a punishment or fine which the law says ought to be imposed in certain cases, and which it has been observed, is somewhat in analogy to the action of *qui tam,* goes to the party who has been injured and has brought the suit." To the same effect is the definition of this court in the case of *Pacific etc. Co.* v. *Alaska Packers Assn.,* 138 Cal. 632 [72 Pac. 161], as follows: " . . . [P]unitive damages are given as a punishment beyond what a plaintiff has actually suffered. . . . " It follows that the court should not have included in the judgment any sum by way of exemplary damages because it was not proper or just to attempt to punish the defendant after his demise.

It is not solely a question of jurisdiction or whether the court had the power to enter a judgment *nunc pro tunc,* but also a question of whether it was just and right after the defendant Gibson's death to assess a fine against him. We have held that punitive damages may not be recovered against personal representatives, but by sustaining the inclusion within the judgment of punitive damages we are doing indirectly that which we refuse to permit directly. Such does not comport with my idea of justice. It would be a different question had the decision been announced before the death of the defendant—but after his death was made to appear of record the fine should not have been levied. The judgment should be modified accordingly.

Preston, J., concurred.

Rehearing denied.

Preston, J., and Thompson, J., voted for a hearing.