[S.F. No. 24815. Dec. 5, 1985.]

ROBERT Z. MARDIKIAN, a Judge of the Superior Court, Petitioner, v. COMMISSION ON JUDICIAL PERFORMANCE, Respondent.

474

## COUNSEL

Miles, Sears & Eanni, Carmen A. Eanni and William J. Seiler for Petitioner.

John K. Van de Kamp, Attorney General, Eddie T. Keller and Gary A. Binkerd, Deputy Attorneys General, for Respondent.

## OPINION

**THE COURT.**\*—Judge Robert Z. Mardikian of the Fresno County Superior Court has petitioned for review of a recommendation by the Commission on Judicial Performance (Commission) that he be publicly censured for conduct which the Commission has found to constitute "conduct prejudicial to the administration of justice that brings the judicial office into disrepute." (Cal. Const., art. VI, § 18, subd. (c) [hereafter section 18(c)];[1] Cal. Rules of Court, rule 919(b).) The bases for the Commission recommendation are the prolonged, even extraordinary, delay by petitioner in the decision of 14 cases which he had under submission, and his execution of salary affidavits and receipt of salary during periods in which these cases had been under submission in excess of 90 days.

In this review the court makes an independent evaluation of the evidence taken in proceedings before the Commission to determine whether the Commission findings are supported by clear and convincing evidence, after which we must determine whether the conduct that is the subject of the proceeding constitutes a basis for censure or removal, and, if so, the

---

\*Before Grodin, Acting C. J., Mosk, J., Reynoso, J., Lucas, J., Kaus, J.,† Woods, J.,‡ and Lillie, J.‡

[1] Section 18(c) provides: "On recommendation of the Commission on Judicial Performance the Supreme Court may (1) retire a judge for disability that seriously interferes with the performance of the judge's duties and is or is likely to become permanent, and (2) censure or remove a judge for action occurring not more than 6 years prior to the commencement of the judge's current term that constitutes wilful misconduct in office, persistent failure or inability to perform the judge's duties, habitual intemperance in the use of intoxicants or drugs, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute. The commission may privately admonish a judge found to have engaged in an improper action or a dereliction of duty, subject to review in the Supreme Court in the manner provided for review of causes decided by a court of appeal."

†Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

‡Assigned by the Acting Chairperson of the Judicial Council.

appropriate action. (*Gubler* v. *Commission on Judicial Performance* (1984) 37 Cal.3d 27, 35 [207 Cal.Rptr. 171, 688 P.2d 551]; *Spruance* v. *Commission on Judicial Qualifications* (1975) 13 Cal.3d 778, 784, fn. 5 [119 Cal.Rptr. 841, 532 P.2d 1209]; *Geiler* v. *Commission on Judicial Qualifications* (1973) 10 Cal.3d 270, 275-276 [110 Cal.Rptr. 201, 515 P.2d 1].)

## I.

As to the facts underlying the Commission's recommendation there is little dispute. The Commission adopted, with minor modifications, the report of the Special Masters appointed by this court pursuant to California Rules of Court, rule 907. ■ ■ ■ ■ After a hearing which commenced on August 6, 1984, and concluded on August 13, 1984, the masters found that between December 1980 and November 1983 Judge Mardikian had failed to decide 14 cases within 90 days of their submission,[2] and that 7 of these cases had remained undecided for periods in excess of the statutory[3] and constitutional[4] time notwithstanding prior investigation by

---

[2]Although rule 22.5 defines submission of a cause pending in a Court of Appeal, no comparable rule has been adopted for trial courts. Rule 22.5 provides: "(a) A cause pending in a Court of Appeal is submitted when the court has heard oral argument, or has approved a waiver of oral argument, and the time has passed for filing all briefs and papers, including any supplementary brief permitted by the court. [¶] (b) Submission may be vacated only by an order stating the reasons therefor. The order shall provide for resubmission of the cause."

It is generally understood, however, that in a nonjury matter a case is submitted for decision by the judge when all of the evidence has been received and all briefs or memoranda authorized to be filed after trial have been received. (See Code Civ. Proc., §§ 632, 669; *Leavitt* v. *Gibson* (1935) 3 Cal.2d 90 [43 P.2d 1091]; *Estate of Pillsbury* (1917) 175 Cal. 454 [166 P. 11, 3 A.L.R. 1396].) Petitioner and the Commission appear to share this understanding of the meaning of the term.

[3]Government Code section 68210: "No judge of a court of record shall receive his salary unless he shall make and subscribe before an officer entitled to administer oaths, an affidavit stating that no cause before him remains pending and undetermined for 90 days after it has been submitted for decision."

[4]California Constitution, article VI, section 19: "The Legislature shall prescribe compensation for judges of courts of record. [¶] A judge of a court of record may not receive the salary for the judicial office held by the judge while any cause before the judge remains pending and undetermined for 90 days after it has been submitted for decision."

Petitioner observes that neither this constitutional provision nor Government Code section 68210 mandates that cases be decided within 90 days of their submission. Nonetheless, the 90-day provision which has been a part of the Constitution since its adoption in 1879, and section 68210 which replaced the affidavit requirement formerly in the Constitution (art. VI, former § 24) and became operative on November 9, 1966, with the passage of Assembly Constitutional Amendment No. 13, 1966 First Extraordinary Session, at the November 8, 1966, General Election, reflect the judgment of the Legislature and the electorate that this period affords a reasonable time within which to expect a trial judge to carry out the basic responsibility of a judge to decide cases. (See now Code Civ. Proc., § 170.)

and communication from the Commission regarding the delays in deciding the first 7 of the 14 cases under investigation.[5]

During the period in which the cases submitted to him for decision remained undecided in excess of 90 days Judge Mardikian made orders "resubmitting" some or all of the 14 cases[6] executed salary affidavits in conformity with the requirement of Government Code section 68210 attesting to the fact that no causes pending before him had remained undecided for 90 days, and received his judicial salary.

There is a background to these cold statistics which is also reflected in the Commission's report. As noted above, the period of decisional delay which is the subject of the Commission's inquiry began in December 1980. The record establishes that during the period in question petitioner suffered from health and family problems. His marriage of 23 years ended in a sometimes acrimonious dissolution proceeding commenced in 1981. He suffered severe depression and emotional upset during those events. At the time of the hearings he was grossly overweight, and had experienced difficulty in breathing, fatigue, and inability to work efficiently. It was discovered during this time that he suffered from diabetes and cardiomyopathy. Medical treatment, weight reduction, and the implantation of a pacemaker have since assisted petitioner in regaining some of his former vigor and productivity. His personal life has stabilized and he has remarried.

Moreover, apart from the delays which are the focus of the present proceeding, the record shows petitioner to be a hard-working and diligent judge

---

[5]The 14 cases, identified here by number and initials only, and the relevant dates on which action was taken, are:

| CASE | DATE OF SUBMISSION | DATE OF DECISION | TOTAL DAYS |
|---|---|---|---|
| No. 1 L v. L | 12/15/80 | 2/18/82 | 430 |
| No. 2 G v. G | 1/30/81 | 2/9/82 | 375 |
| No. 3 H v. F | 3/24/81 | 3/2/82 | 343 |
| No. 4 J v. R | 7/10/81 | 2/10/82 | 215 |
| No. 5 P v. J | 7/30/81 | 6/23/82 | 328 |
| No. 6 B v. B | 8/17/81 | 2/12/82 | 179 |
| No. 7 S v. C | 9/15/81 | 4/13/82 | 210 |
| No. 8 G v. G | 9/17/82 | 11/5/83 | 414 |
| No. 9 F v. F | 9/22/82 | 10/5/83 | 378 |
| No. 10 G v. B | 2/9/83 | 11/10/83 | 274 |
| No. 11 P v. A | 2/18/83 | 10/14/83 | 238 |
| No. 12 O v. O | 3/16/83 | 10/7/83 | 205 |
| No. 13 K v. K | 4/22/83 | 10/12/83 | 173 |
| No. 14 I v. I | 6/24/83 | 11/2/83 | 131 |

[6]Although some of the resubmission orders could not be located in relevant files, on the court's computer, or on its microfilmed records, the masters assumed that the orders had been made as testified to by petitioner and his clerk.

in an over-burdened court. Appointed to the municipal court in June 1974, and elevated to the superior court in July 1977, he has sat as presiding judge of the criminal department, and since July 1, 1983, has served as presiding judge of the 14-judge Fresno County Superior Court. It is uncontradicted that he frequently worked nights and weekends, and between January 1981 and the end of 1983 took only 34 days of vacation, devoting the balance of his vacation time to work on submitted cases. Some of the flavor of the situation which he confronted was presented in the following testimony before the Commission.

Judge Frank J. Creede, Jr., who had been presiding judge of the Fresno County Superior Court from July 1, 1982, to June 30, 1983, was called as a witness by the examiners. He testified on cross-examination that during his tenure as presiding judge both the civil and criminal calendars of the court were heavily impacted. A 13th department of the court had been authorized, but was not filled until December 1982. During that year trials in three or four capital cases were held. Judges assigned to civil matters had to be reassigned to criminal cases in which defendants had asserted their statutory and constitutional rights to speedy trial. Pro tem. judges were obtained and judges were assigned from other counties. Fresno County then had the highest volume of criminal cases per judge in the state, and ranked number one in the state in number of jury trials. The 250 jury trials during the 1982-1983 fiscal year averaged 16.7 per judicial position, an average which included judges who were not actually presiding over jury trials, including juvenile court judges and referees, family law judges, and the presiding judge and criminal master calendar judge.

During the 1982-1983 fiscal year petitioner served as assistant presiding judge, and, in the words of Judge Creede, tried one case after another. New criminal trials were assigned and commenced as soon as the prior matter went to the jury. In addition to this workload petitioner assumed the duties of the presiding judge if Judge Creede was not available. Petitioner was among the judges disqualified the least often by litigants pursuant to section 170.6 of the Code of Civil Procedure.

During this same period the support staff for the judges of the Fresno County Superior Court was woefully inadequate. The thirteen judges were assisted by four staff attorneys and four secretaries. Judge Creede also testified that during his year as presiding judge he was very reluctant to give any judge chambers time because of the heavy trial calendar. Although he had no specific recollection he "wouldn't doubt that" he had on one occasion when he found petitioner in chambers working on cases during vacation assigned cases to him during vacation.

Judge Hollis G. Best of the Fresno County Superior Court had been presiding judge from July 1, 1979, through June 30, 1980. During that time petitioner had acted as presiding judge of the criminal courts. In the opinion of Judge Best petitioner had served extremely well in that position.

The executive officer and jury commissioner of the Fresno County Superior Court, Julian Johnson, retired from that position at the end of July 1982. One of his reasons for retiring was his belief that the workload of the superior court judges was unconscionable. In the year and one-half prior to his retirement one judge had died and another retired after suffering a heart attack.[7] The court had more criminal cases than it could handle and tried to get some civil cases out. On one occasion Johnson suggested to petitioner that he take vacation and then come in to work on his backlog of cases. This was suggested because as long as a judge was present he was considered to be available for purposes of trial assignments, and there were always cases that had to be tried. Petitioner was having a problem resolving his cases "just because he didn't have the time." He did request chambers time through Johnson, who relayed the request to the presiding judge, but the presiding judge was having "serious problems of his own," so Johnson suggested that petitioner take vacation in order to have time to work on his cases.

Petitioner's clerk testified that she knew, from her own knowledge, that petitioner worked on cases under submission whenever he had time at court, took files home to work on them, and was at the court working on his submitted cases on weekends, during the week when she left at 5 p.m., and while he was on vacation.

Justice Charles Hamlin, who at the time of the hearing had become an associate justice of the Fifth District Court of Appeal, had been a judge of the Fresno County Superior Court until late December 1982. As such he had been presiding judge of the latter court from July 1, 1981, through June 30, 1982. He recalled that counsel for the parties in two of the submitted cases had contacted him regarding the lengthy submissions. At that time

---

[7] Judge Wilbur Kessler, who had served on the Fresno County Superior Court until retiring after suffering a heart attack in September 1981, corroborated this view of the workload of the superior court judges in that county. He, himself, had no time to work on submitted cases during his normal working hours which were from 7:30 a.m. to 6 p.m. He often observed petitioner already at work when he arrived at 7 a.m. and still at work when he left at 6 p.m. He also confirmed the practice of assigning jury trials back to back with a new one assigned as soon as the jury went out on one just completed. At the time he suffered a heart attack he, too, had been working holidays and weekends to prepare decisions in submitted cases in which there had been court trials. He was forced by his illness to order some of these cases resubmitted.

petitioner was assistant presiding judge and was taking a regular calendar assignment. Petitioner rarely attended the monthly judges meeting because he was on the criminal court which, according to Justice Hamlin, was a "nightmare." Petitioner could not get away to attend. When Justice Hamlin received a copy of the initial inquiry from the Commission he discussed the matter with petitioner to find out "how bad a position he was in so I could know how much time I was going to have to take him off the regular trial assignment. There was nothing else to do . . . . Unless it meant letting a criminal case go beyond the time limit, I was going to give him some time. I knew he hadn't had any and so I was going to give him some one way or another." It was agreed at that time that petitioner would be given two weeks off the regular trial assignment, if no criminal case had to be assigned out for trial. However, Justice Hamlin testified "[e]ven though I declared my intention to give him two weeks, I had to interrupt him" because of the criminal calendar. Justice Hamlin appeared before the county board of supervisors three times during this period to ask for more help and "really couldn't emphasize enough that I felt we were in real trouble, that our judges were working harder than just anybody could be asked to work."

Justice Robert Martin of the Fifth District Court of Appeal had been a judge of the Fresno County Superior Court until December 27, 1982. He had served as presiding judge of the superior court from July 1, 1980, through June 30, 1981. During that time there was little, if any, time that could be given to judges of that court to work on their caseload in chambers. Petitioner used his lunch hour for medical appointments. Justice Martin suggested that since this was the only time petitioner could have any rest or relief from his trial schedule, he should instead recess early. On one or two occasions while he was presiding judge Justice Martin had found some chambers time for petitioner, but not as much time as Justice Martin knew petitioner needed. He made "the best possible effort every time I had such a request. But it usually was very difficult because of the trial calendar. In Fresno the practice was to keep every judge in trial five days a week as much as possible."

## II.

On the basis of this record the Commission made certain factual findings that are not in dispute: that delays occurred in the decision of 14 cases as detailed above, and that the resubmission orders were made "without request by or consent of the parties or their counsel involved." The Commission rejected proposed findings that the delays were the product of "an intentional disregard of and refusal of and refusal to perform judicial duties"; that many of the salary affidavits which petitioner executed were

"false and knowingly believed to be false"; and that petitioner "deliberately and intentionally attempted to evade constitutional and statutory requirements by resubmitting undecided cases." The Commission concluded, in part, that petitioner was *not* guilty of "persistent failure or inability to perform his judicial duties," nor was he guilty of "willful misconduct in office." Naturally, petitioner does not challenge these favorable findings and conclusions.

██ The focus of our present inquiry is upon the Commission's further finding that the resubmission orders which petitioner made in the 14 cases were made "without good cause," and its conclusion overall that petitioner was guilty of "conduct prejudicial to the administration of justice which brings the judicial office into disrepute." Viewing the totality of petitioner's conduct in the context in which it occurred we are constrained, with reservations, to agree.

Our reservations stem from the obvious proposition that while a judge can be expected to be diligent, hardworking, and even self-sacrificing when necessary, he cannot be expected upon pain of official discipline to accomplish tasks which are beyond his capacity and resources. ██ When, with "proper application," a judge would be able to decide matters pending before him within 90 days of their submission for decision, but does not do so, the failure to perform is a basis for censure or removal under section 18(c), as a persistent failure to perform judicial duties even if the failure is not an intentional disregard of duties. (*In re Jensen* (1978) 24 Cal.3d 72, 73 [154 Cal.Rptr. 503, 593 P.2d 200].) Censure under the "conduct prejudicial to the administration of justice" clause of subdivision (c) is not appropriate, however, for delays that are neither "persistent" nor avoidable. It would be manifestly unreasonable, and outside the contemplation of article VI, section 18, to censure or remove a competent judge whose workload and/or temporary disability made prompt decision of all matters submitted to him impossible. ██ ██ ██ ██ ██ While delay in deciding cases may well cause criticism and bring the judicial office into disrepute, when that delay is the product of an overburdened and underfunded court the trial judges who are the backbone of the judicial system must not be forced to assume responsibility for a situation which is not of their making or within their control.[8] To the extent that an intolerably burdensome work-

---

[8]Conduct prejudicial to the administration of justice office is an appropriate basis for censure under section 18(c), as a lesser charge when the conduct is not wilful misconduct because undertaken in good faith, if the conduct would appear to an objective observer to be unjudicial and prejudicial to public esteem. (*Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d 270, 283-284.) Regardless of the appearance to the public, however, this constitutional authority may not appropriately be invoked as an alternative to a

load makes prompt decision impossible even for the most conscientious judge, the answer to the problem must lie elsewhere than in judicial discipline.

██ In this case, however, there are factors present which support the Commission's conclusion. A trial judge confronted with a workload which prevents him from deciding all cases promptly can at least minimize the impact of delay so far as possible, by assigning priorities which take into account the time necessary to decide, and the effect of delay upon the parties in, particular matters. This petitioner apparently did not do. As the Special Masters observed in their report to the Commission, eight of the fourteen cases in which decision was delayed involved the dissolution of a marriage with attendant questions, such as child custody, particularly demanding of prompt resolution.[9]

The evidence also supports a conclusion that many of the cases were not complex and might have been decided with relative ease and little expenditure of time shortly after submission.[10] ██ The examiners bear the bur-

---

charge of persistent failure or inability to perform, and asserted as a basis for censure, when the failure to perform is due to causes beyond the control of the judge such as temporary disability or an unmanageable caseload.

[9]The record contains evidence that some of the litigants suffered prejudice from the delay. The evidence does not establish that petitioner was aware of any specific prejudice, although had his decision in case No. 11 been to order specific performance of the agreement in issue, the habeas corpus petitioner might have been released from custody. Delay in resolution of the dissolution proceedings necessarily prejudices the parties who are unable to remarry, utilize assets, or establish stable homes for the children of the marriage.

[10]I.e., case No. 12, O v. O, is described as a dissolution matter in which a single issue remained after stipulation by the parties. It was tried as a short cause matter in 3 hours, but was not decided for 205 days after submission. The issue to be decided involved joint custody of a child. Other cases among the 14 were described by counsel for the parties as involving many complex issues.

Counsel for one of the parties in case No. 8, G v. G, a dissolution matter, had been in practice for 18 years. At the time that matter was submitted about 25 percent of his practice involved family law matters. Of the approximately 500 dissolution matters he had handled, he considered G v. G to be among the most difficult 25 to 50 cases. In addition to the legal issues it presented problems of tracing assets. Although there was a two-day trial, written argument was submitted over a subsequent five-month period after which it was taken under submission. In this case, therefore, not only were there complex issues, but additional matters had been assigned which would have to be deferred at the time petitioner again took up G v. G for study and disposition. Counsel brought the delay in decision to the attention of the presiding judge, "[b]ut I felt that Judge Mardikian was under an unholy case load. I was under the impression because I'd had occasion to know what the calendar was like around the court that since he's one of the persons who's able to try difficult cases and willing to and so forth, that it had all come down that he kept getting one trial after another after another. So that it was very hard for him to turn his attention to any reflective activity for long enough to get out decisions on them."

Counsel for one of the parties in case No. 9, another dissolution proceeding, described the case as the most complex he had handled, involving apparent fraud in the depletion of

den of proving by "clear and convincing evidence sufficient to sustain [the] charge to a reasonable certainty" the commission of conduct warranting censure or removal of a judge from office. (*Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d 270, 275.) The accused, however, has the burden of coming forth with evidence to explain or justify the conduct if he claims that it does not warrant discipline. (Cal. Rules for Censure, etc. of Judges, rule 908(b).) ▮▮▮ Yet, the record does not contain evidence that petitioner gave any consideration to the interests of those litigants whose cases had been under submission for the longest periods, or that he made any effort to establish a schedule of priorities that would give precedence to resubmitted cases over cases tried subsequent to the original submission of those long delayed cases. There is simply no explanation why these cases were not decided before other cases that were tried in the 18-month period during which the resubmissions occurred.

Under these circumstances, petitioner's practice of routinely resubmitting matters which have been long delayed cannot be condoned. We assume, as does the Commission in its findings, that there may be extraordinary circumstances which will justify resubmission of particular cases that have been pending for longer than 90 days.[11] To permit routine utilization of

---

assets of a business after the parties had separated, valuation of the business, disputes over the characterization of assets as separate or community, and disagreement exacerbated by deeply held religious beliefs as to the custody of the children. Among the exhibits submitted for review by petitioner were the books of the business. The statement of decision when issued addressed all issues other than a right to the reimbursement question, and in the view of counsel was a well thought-out decision in light of all the evidence.

Case No. 11, P v. A, was a criminal habeas corpus matter in which the prisoner petitioner sought specific enforcement of an agreement under which he was to be permitted to plead guilty as an accessory, rather than being prosecuted for murder with special circumstances. Exhibits in that case included two or three volumes of reporter's transcripts, each of which was several hundred pages in length. The legal issue was novel and complicated in the view of the deputy district attorney who represented the People in that matter.

[11]In the case of the Court of Appeal, rule 22.5(b) provides that a submission may be vacated and resubmitted by an order "stating the reasons therefor." No comparable rule exists for trial courts. There is a difference, obviously, between the collegial context of an appellate tribunal, in which the concurrence of more than one justice is required for the decision of a cause, and a trial court in which the decisional process is normally within the control of an individual judge. Nonetheless, the Commission concedes, and we agree, that a superior court has inherent power to order vacation of submission given a proper demonstration of cause.

The Commission suggests that proper cause would exist if the parties stipulate to vacation of the order, on the basis of a change of circumstances, or if there exist "extraordinary circumstances" such as sudden illness which prevents the judge from attending to his duties for a protracted period of time, and where reassignment of the matter would cause a delay of equal or greater length. It would be unwise, we think, for this court to attempt an exhaustive definition of good cause absent preliminary guidance from the Judicial Council. Conformity with rule 22.5 by trial court judges in the interim, by stating the reasons for any order vacating and resubmitting a cause, with notice of the order to the parties, should avoid the abuse which the Commission seeks to prevent.

resubmission orders, however, would make a mockery of the constitutional mandate.

Finally, the physical and emotional difficulties that petitioner experienced during a portion of the period in question, while they certainly merit sympathy and may serve in mitigation of the sanction, cannot be accepted as justification per se. A judge who is disabled from performing his duties in timely fashion has an obligation to seek relief, even to the extent of withdrawing temporarily or permanently from the functions of his office if the circumstances require it. His conduct as a judge must be evaluated on the basis of objective criteria applicable to all judges similarly situated within the system.

We conclude, therefore, that the extraordinary delay in the decision of these submitted cases, and petitioner's practice of routinely ordering these cases resubmitted beyond the 90-day period, warrants censure as being "prejudicial to the administration of justice that brings the judicial office into disrepute."

### III.

Finally, we consider the propriety of the sanction which the Commission imposed. Public censure was adopted as the Commission recommendation by a five-member majority of the eight-person panel, with the minority favoring private admonishment. The protracted delay in the decision of the cases under review here persuades us that public censure is proper in this case. Subject to the reservations we have expressed, we adopt the Commission's recommendation. This opinion will serve as the appropriate sanction.

KAUS, J.*—I respectfully dissent. Petitioner is being made the scapegoat for the twin plagues of judicial overload and backlog—evils that were apparently well entrenched when Shakespeare had Hamlet deplore "the law's delay."

The situation which prevailed in Fresno at the relevant times is dramatically described by the majority. Its opinion also recognizes that it would be unreasonable to discipline a competent judge whose workload or temporary disability made prompt decision of all matters submitted to him impossible. It further notes, correctly, that while delay may well bring the judicial office into disrepute, individual judges must not be held responsible "when that

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

delay is the product of an overburdened and underfunded court." Finally—with one possible caveat—the majority goes out of its way to note that petitioner worked as hard as he could, which, it seems, was a good deal harder than the public had a right to expect of even the most conscientious public servant.

Why then is petitioner being disciplined?[1]

The majority chides petitioner for not assigning priorities to the submitted cases—a practice which, it surmises, would have minimized the impact of delay. Having apparently reviewed all 14 cases, the majority is able to cite only one—No. 12, O. v. O.—as a simple case which a system of priorities would have promoted to the head of the line. The fact is that O. v. O. was third from last to be submitted and was decided ahead of three cases which had been submitted earlier. (See majority opn., fn. 4.) Apparently it *was* considered on a priority basis.[2] Nowhere is there any suggestion that all 14 cases would have been disposed of sooner had petitioner used a different set of priorities.

The only other criticism voiced by the majority is that petitioner, in spite of physical and emotional difficulties, did not seek relief, "even to the extent of withdrawing temporarily or permanently from the functions of his office." (*Ante,* p. 485.) Applied to this case, it is difficult to take this reprimand seriously. The record fairly reeks with petitioner's efforts to seek relief. As far as "withdrawing" from the functions of his office is concerned, there is nothing in the record to suggest that such drastic action would have done anything for the 14 cases under consideration except to cause further delay. In any event, is a judge who does the best he can under trying personal conditions to be disciplined for not choosing the perfect moment to grant himself a leave of absence or to retire?

As the majority recognizes, unlike justices of the Court of Appeal who can look to rule 22.5 of the California Rules of Court for guidance in

---

[1] I am particularly shocked that the majority has opted for public censure rather than private admonishment. I realize that in spite of the procedures adopted by us in *Gubler* v. *Commission on Judicial Performance* (1985) 37 Cal.3d 27, 62 [207 Cal.Rptr. 171, 688 P.2d 551], private admonishment is private in name only. Nevertheless, its imposition obviously implies a lesser degree of culpability than public censure.

[2] In criticizing petitioner for not giving "precedence to resubmitted cases over cases tried subsequent to the original submission" of the older cases (*ante,* p. 484), the majority loses sight of the fact that petitioner did request "chambers time" to work on the earlier submitted cases, but that because of the court's criminal caseload deadlines the presiding judge was not able to afford petitioner the time that was needed but instead assigned him to hear more current cases.

applying the "90 day rule," trial court judges currently have no rule to consult in determining how to deal with the problems resulting from an understaffed bench and an overcrowded docket. Although the adoption of an explicit schedule of priorities—which the majority suggests—may well be a sensible approach, before today's decision no authority made it clear that the failure to establish such a schedule would itself be grounds for discipline. Trial judges—no less than other mortals—need to know what rules apply and should not be disciplined for failing to follow rules before they are promulgated.

I dissent.

Reynoso, J., concurred.