*CJP Supp. 227 Opinion
HORN, Chairperson.
Under California law, judges are expected to decide matters submitted to them within 90 days of submission, and are prohibited from receiving their salaries during times when they have undecided matters under submission for more than 90 days. (Cal. Const., art. VI, § 19; Mardikian v. Commission on Judicial Performance (1985) 40 Cal.3d 473, 477, fn. 4 [220 Cal.Rptr. 833, 709 P.2d 852] (Mardikian).) To implement the latter provision, the Government Code requires judges to regularly execute affidavits declaring they are in compliance with the law and entitled to salary. (Gov. Code, § 68210.) In this disciplinary proceeding, Judge Robert B. Freedman of the Alameda County Superior Court is charged by an amended notice of formal proceedings (Notice) in three counts with (1) failing to decide causes submitted to him for decision within 90 days, (2) executing and submitting numerous salary affidavits falsely stating that he had no causes under submission to him for decision for more than 90 days when he did have such matters under submission, and (3) failing to act on over 200 fee waiver applications by litigants within the time allowed by law.
A panel of three special masters appointed by the California Supreme Court heard evidence in this disciplinary proceeding, made factual findings and issued their conclusions of law. The masters found that between 2000 and 2004 Judge Freedman failed to timely rule in 21 of the 23 specified causes charged in the Notice, that he regularly submitted false salary affidavits during times when his rulings were overdue, and that in 2003, he failed to timely dispose of over 200 applications for waiver of court fees by litigants in the Alameda County Superior Court. The masters concluded Judge Freedman’s failure to complete his assigned duties on a timely basis and his submission of false affidavits were conduct “prejudicial to the administration of justice that [brought] the judicial office into disrepute.” (Cal. Const., art. VI, § 18, subd. (d).) *CJP Supp. 228 We have reviewed the evidence taken by the masters and have considered their findings and conclusions. In large part, we adopt or defer to the masters’ findings and conclusions, including in part their conclusion that Judge Freedman committed prejudicial misconduct when he was aware that he had overdue rulings and submitted false salary affidavits anyway. In certain instances which we discuss, we conclude, based on the masters’ findings, that Judge Freedman’s reckless submission of erroneous salary affidavits at times when he was aware he had overdue rulings, with disregard for whether they were true or false, was willful misconduct. Misconduct of such gravity has warranted removal from office. However, in view of the unique circumstances of this case, including exceptional mitigating evidence, we have determined to issue this severe public censure.
PROCEDURAL HISTORY
Judge Freedman was appointed to the Municipal Court of Alameda County in January 1996, and became a judge of the Alameda County Superior Court in July 1998. On September 15, 2006, after a preliminary investigation and the issuance of an initial notice of formal proceedings, the commission issued its first amended notice of formal proceedings in this matter. The Notice charged Judge Freedman in three counts with the following misconduct:
Count 1: Delaying rulings on matters for more than 90 days after they were submitted to him in 23 instances in the period 2000 to 2004. The Notice charged that a number of the delays occurred after Judge Freedman had twice been warned by presiding judges about overdue rulings, once in April 2001, and again around the end of December 2002.
Count 2: Executing and submitting false state and county salary affidavits during the periods June 2000 to April 2001, August 2002 to February 2003, June 2003 to August 2004, and October 2004, all periods in which Judge Freedman allegedly had matters under submission upon which he had not ruled for more than 90 days.
Count 3: In the first half of 2004, failing to act “within applicable deadlines” on litigants’ applications for waiver of the requirement they pay filing and other court fees. Under the law that applied, if the applications were not denied within five days of filing, they were automatically granted. The delays caused the Alameda County Superior Court to order refunds to some litigants whose applications were denied late, at a total cost to the court of $9,894.
*CJP Supp. 229 The Supreme Court appointed three special masters at the commission’s request. (Rules of Com. on Jud. Performance, rule 121.)[1] The special masters were the Hon. Eugene M. Premo, Associate Justice of the Court of Appeal, Sixth Appellate District, the Hon. Kathryn Doi Todd, Associate Justice of the Court of Appeal, Second Appellate District, Division Two, and the Hon. William A. Mayhew, Judge of the Superior Court of Stanislaus County. The masters held an evidentiary hearing, and their report was filed with the commission on February 14, 2007. Judge Freedman is represented in this proceeding by Joseph P. McMonigle and Kathleen M. Ewins of San Francisco. The examiners for the commission are Andrew Blum and Valerie Marchant.
The masters found virtually all the charges were proved by clear and convincing evidence. They found that Judge Freedman had delayed rulings in 21 of the 23 charged instances (count 1), that he had “regularly” executed false salary affidavits during periods when his rulings were delayed (count 2), and that he had delayed in ruling on “approximately 200” applications for fee waivers, with resulting refunds to litigants (count 3).
The masters found in mitigation that Judge Freedman is a hardworking, industrious, and highly competent judge who has not committed other misconduct and is unlikely to offend again. Their findings were based in large part on testimony by a number of judges and attorneys who described Judge Freedman’s good character, skills, and contributions to the judiciary.
In their legal conclusions, the masters determined that Judge Freedman committed prejudicial misconduct in connection with all the charges. As explained in the following discussion, we adopt and summarize the masters’ findings of fact, and adopt most of their conclusions of law.
DISCUSSION
I.
GENERAL PRINCIPLES
A. Judicial Salary Imw
The California Constitution provides that a judge may not receive a salary “while any cause before the judge remains pending and undetermined for 90 days after it has been submitted for decision.” (Cal. Const., art. VI, *CJP Supp. 230 § 19; see also, e.g., Hassanally v. Firestone (1996) 51 Cal.App.4th 1241, 1244 [59 Cal.Rptr.2d 625].) However, the withheld salary is not forfeited; once the overdue matters are completed, the judge is again entitled to receive his or her salary, including those amounts that were not paid during the period of delay. (Hassanally, supra, at p. 1244.) To implement the constitutional provision, Government Code section 68210 requires judges to execute an “affidavit” attesting to their compliance with the Constitution in order to receive their salaries.[2] These provisions have been California law since 1879. (See Cal. Const., art. VI, former § 24, adopted in Cal. Const, of 1879 [requiring execution of affidavit affirming no cause pending for 90 days to receive salary].) The provisions that deny judges their salaries if they fail to rule in the time allowed by law “reflect the judgment of the Legislature and the electorate that this period [90 days] affords a reasonable time within which to expect a trial judge to carry out the basic responsibility of a judge to decide cases.” (Mardikian, supra, 40 Cal.3d at p. 477, fn. 4.) Failure to decide a matter within the 90-day period is cause for judicial discipline. (Mardikian, supra, at p. 485; see also, e.g., Hassanally, supra, at p. 1244.)
B. Standards for Imposition of Discipline
In determining whether Judge Freedman has committed misconduct, we apply the law of judicial discipline as it has evolved in California. The levels or types of judicial misconduct that may subject a judge to discipline by the commission are described in article VI, section 18, subdivision (d), of the California Constitution. The commission must prove the charges against Judge Freedman by clear and convincing evidence. (Doan v. Commission on Judicial Performance (1995) 11 Cal.4th 294, 313 [45 Cal.Rptr.2d 254, 902 P.2d 272]; Geiler v. Commission on Judicial Qualifications (1973) 10 Cal.3d 270, 275 [110 Cal.Rptr. 201, 515 P.2d 1].) “Evidence of a charge is clear and convincing so long as there is a ‘high probability’ that the charge is true. [Citations.] The evidence need not establish the fact beyond a reasonable doubt.” (Broadman v. Commission on Judicial Performance (1998) 18 Cal.4th 1079, 1090 [77 Cal.Rptr.2d 408, 959 P.2d 715] (Broadman).)
1. Willful Misconduct.
The most serious form of wrongdoing is willful misconduct, which is (1) unjudicial conduct that is (2) committed in bad faith (3) by a judge acting in his or her judicial capacity. (Broadman, supra, 18 Cal.4th at p. 1091; Dodds v. Commission on Judicial Performance (1995) 12 Cal.4th 163, 172 [48 *CJP Supp. 231 Cal.Rptr.2d 106, 906 P.2d 1260].) Conduct inconsistent with the provisions of the California Code of Judicial Ethics is generally considered unjudicial conduct, but that code is not the only standard by which we may measure a judge’s conduct. (Dodds, supra, at p. 173, fn. 2.) The “bad faith” requirement for willful misconduct is satisfied when a judge is “(1) performing a judicial act for a corrupt purpose (which is any purpose other than the faithful discharge of judicial duties), or (2) performing a judicial act with knowledge that the act is beyond the judge’s lawful judicial power, or (3) performing a judicial act that exceeds the judge’s lawful power with a conscious disregard for the limits of the judge’s authority.” (Broadman, supra, at p. 1092.) In Broadman, the Supreme Court described “conscious disregard” as follows: “Because transgressing the limits of a judge’s lawful authority is not the faithful discharge of judicial duties, a judge who performs such acts with no regard at all for whether they are legally permitted cannot be said to be acting with a purpose to faithfully discharge judicial duties. Thus, a judge’s reckless or utter indifference to whether judicial acts being performed exceed the bounds of the judge’s prescribed power is a state of mind properly characterized as bad faith.” {Ibid.)
Finally, a judge acts in a “judicial capacity” when the “judge is . . . performing one of the functions, whether adjudicative or administrative in nature, that are associated with the position of a judge or when the judge uses or attempts to use the authority of the judicial office for an improper purpose.” (Broadman, supra, 18 Cal.4th at p. 1104, citing Dodds v. Commission on Judicial Performance, supra, 12 Cal.4th at p. 172.)
2. Prejudicial Misconduct.
Our Supreme Court has defined prejudicial misconduct, the second most serious category of judicial misconduct, as follows: “Prejudicial conduct is distinguishable from willful misconduct in that a judge’s acts may constitute prejudicial conduct even if not committed in a judicial capacity, or, if committed in a judicial capacity, not committed in bad faith. Prejudicial conduct is ‘either “conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office” [citation] or “willful misconduct out of office, i.e., unjudicial conduct committed in bad faith by a judge not then acting in a judicial capacity” [citation].’ [Citation.] In this context, bad faith means a culpable mental state beyond mere negligence and consisting of either knowing or not caring that the conduct being undertaken is unjudicial and prejudicial to public esteem. In sum, to constitute prejudicial conduct, a judge’s actions must bring ‘the judicial office into disrepute,’ that is, the conduct would appear to an *CJP Supp. 232 objective observer to be prejudicial to ‘ “public esteem for the judicial office.” ’ [Citation.]” (Broadman, supra, 18 Cal.4th at pp. 1092-1093, original italics.)
3. Improper Action.
The least serious type of judicial misconduct is improper action. It is conduct that violates the California Code of Judicial Ethics, but that does not rise to the level of prejudicial misconduct. (Rothman, Cal. Jud. Conduct Handbook (2d ed. 1999) § 13.29, pp. 386-3870 Improper action thus includes unjudicial conduct that an objective observer aware of the circumstances would not necessarily deem to have an adverse effect on the reputation of the judiciary. (See Adams v. Commission on Judicial Performance (1995) 10 Cal.4th 866, 897-899 [42 Cal.Rptr.2d 606, 897 P.2d 544].)
4. Consideration of Mitigating Evidence.
Evidence in mitigation may be used in considering the totality of the circumstances that are pertinent to our determination of the appropriate discipline. (Broadman, supra, 18 Cal.4th at p. 1112; see also Adams v. Commission on Judicial Performance, supra, 10 Cal.4th at p. 912.)
II.
FINDINGS OF FACT AND CONCLUSIONS OF LAW
Our findings of fact are taken primarily from those of the special masters, whose factual findings we defer to or adopt in their entirety, supplemented with additional evidentiary detail and our own findings where additional findings are necessary to our decision and shown by clear and convincing evidence. (Geiler v. Commission on Judicial Qualifications, supra, 10 Cal.3d at p. 275 [commission has authority to make its own findings]; but see also, e.g., Broadman, supra, 18 Cal.4th at p. 1090 [factual findings of masters on issues of credibility may be given special weight because masters have “the advantage of observing the demeanor of the witnesses”].) Although we agree with most of the legal conclusions the masters reached, we also make our own legal conclusions based on our independent review of the record. (See Broadman, supra, at p. 1090 [commission’s power to reach legal conclusions].)
A. Count 1—Findings of Fact
Count 1 of the Notice is subdivided into 23 lettered subcounts, each corresponding to one or more instances of delay in a case assigned to Judge *CJP Supp. 233 Freedman. The masters found by clear and convincing evidence that Judge Freedman had delayed rulings over 90 days in 21 of the 23 instances charged in the Notice. The parties do not object to these findings, and we adopt and summarize them below. The delayed rulings occurred in three distinct periods, during which Judge Freedman had at least one delayed matter[3] pending: June 16, 2000, to April 19, 2001, August 4, 2002, to February 7, 2003, and June 16, 2003, to November 3, 2004.
2000-2001
From 2000 until early 2002, Judge Freedman was assigned to preside over criminal cases in the Oakland courthouses of the Alameda County Superior Court. During that time, he occasionally sat as a substitute judge in the civil law and motion department. During those temporary assignments, among other matters, Judge Freedman heard motions in the Alameda, Paula, Bellamy, CSK, Contra Costa, and BART cases,[4] identified in the Notice as subcounts A through G. The following delays occurred in those matters:
1. Count 1A {Alameda). Alameda was submitted on March 23, 2000. The 90th day after submission was June 21, 2000. Judge Freedman did not decide the matter until April 16, 2001, 299 days after the matter had been under submission for 90 days.
2. Count IB {Paula). Paula was submitted on November 20, 2000. Judge Freedman did not decide the matter until March 19, 2001, 29 days after the matter had been under submission for 90 days.
3. Count 1C {Bellamy). The Bellamy matter was submitted on November 29, 2000. Judge Freedman did not decide the matter until March 23, 2001, 24 days after the matter had been under submission for 90 days.
4. Count ID {CSK). The CSK matter was submitted on January 5, 2001. Judge Freedman did not decide the matter until April 19, 2001, 14 days after the matter had been under submission for 90 days.
5. Count IE. The masters found the delay charged in count IE was not proved because no evidence was submitted in support of the charge. We adopt the finding, and dismiss count IE.
6. Count IF {Contra Costa). The Contra Costa matter was submitted on January 11, 2001. Judge Freedman decided the matter on April 16, 2001, five days late.
*CJP Supp. 234 7. Count 1G (BART). The BART matter was submitted to Judge Freedman for decision on January 16, 2001, but he did not decide it until April 19, 2001, three days late.
During the period in which these delays occurred, Judge William McKinstry was the presiding judge of the Alameda County Superior Court. Presiding judges are required to monitor the status of submitted cases in their courts to ensure that “no cause under submission remains undecided and pending for longer than 90 days.” (Cal. Rules of Court, rule 10.603(c)(3) [former rule 6.603].) In early March 2001, Judge McKinstry inquired about the status of submitted cases, and learned from the court’s senior research attorney that Judge Freedman had delayed matters in the Alameda, Bellamy, and Paula cases, and that the Contra Costa case had been under submission to Judge Freedman for at least 60 days.
Judge McKinstry met with Judge Freedman a few days after learning of these decisional delays, and supplied him with a list of the overdue and soon-to-be overdue matters. Soon after the meeting, Judge Freedman decided the Paula matter (on Mar. 19, 2001) and the Bellamy matter (on Mar. 23, 2001), but the other overdue case, Alameda, at that point nearly a year past submission, remained undecided.
On April 11, 2001, Judge McKinstry sent Judge Freedman a memo urging him to decide his remaining overdue matters, and again identified the Alameda and Contra Costa matters by name. In the memo, Judge McKinstry reminded Judge Freedman that his duty to decide cases took priority over other matters, and that his “indecision” could result in discipline by this commission. Judge McKinstry also reminded Judge Freedman of a judge’s obligation to submit accurate salary affidavits stating he or she has no overdue matters as a condition of receiving salary.
On April 16, 2001, Judge Freedman decided the Alameda and Contra Costa matters. On April 19, 2001, Judge McKinstry sent Judge Freedman another memo, again urging him to decide his remaining delayed matters, and listing specifically the by then overdue BART and CSK matters. Judge McKinstry informed Judge Freedman that he would be relieved of all committee matters effective April 23, 2001, if he had not cleared his backlog of delayed matters. In the April 19 memo, Judge McKinstry again reminded Judge Freedman that judges must execute an affidavit attesting that they have no delayed matters to be entitled to salary. On the same day, April 19, 2001, Judge Freedman decided the BART and CSK matters, clearing his backlog of overdue matters.
*CJP Supp. 235 2002-2003
In early 2002, Judge Freedman was reassigned to a civil department of the Alameda County Superior Court in Oakland. Judge McKinstry had been succeeded by Presiding Judge Harry Sheppard. While in his civil assignment and during Judge Sheppard’s tenure as presiding judge, Judge Freedman failed to timely decide the matters charged in counts 1H to 1J.
1. Count 1H (Slauson). On May 6, 2002, a matter in the Slauson case[5] was submitted to Judge Freedman. Judge Freedman did not decide the matter until January 31, 2003, 179 days overdue.
2. Count II (O’Toole). On July 2, 2002, a matter in the O’Toole case was submitted to Judge Freedman. The parties wrote to Judge Freedman on September 25, 2002, to inquire about the status of the matter, and wrote again to Judge Freedman in January 2003. Judge Freedman did not decide the matter until February 7, 2003, 130 days overdue.
3. Count 1J (Willard). On July 8, 2002, a matter in the Willard case[6] was submitted to Judge Freedman. Judge Freedman filed his decision in the Willard matter on January 15, 2003, 101 days overdue.
On or around December 27, 2002, while all three of the matters charged for the 2002-2003 period were pending and overdue for rulings, Presiding Judge Sheppard learned from the lead research attorney that Judge Freedman again had matters that had been pending and under submission for longer than 90 days. Judge Sheppard met with Judge Freedman within a week of December 27, 2002, discussed the overdue rulings with him, and showed or gave him a list of the overdue cases. In the month following that meeting, Judge Freedman filed his rulings in the three overdue matters, Slauson, O’Toole, and Willard.
2003-2004
After clearing his backlog in early 2003, Judge Freedman continued to hear civil cases, and he again fell behind on his rulings. At the end of November 2003, Judge Freedman was appointed to the position of assistant presiding judge, and was assigned to supervise the Hayward branch of the Alameda *CJP Supp. 236 County Superior Court. The Hayward branch was larger than many other county superior courts. In addition to his duties as supervising judge, Judge Freedman also heard law and motion calendars, family law calendars, and court trials, among other things. The Notice charged and we find that Judge Freedman incurred delays of over 90 days before ruling in the following matters:
1. Count 1H (Slauson). On March 18, 2003, a second matter in the Slauson case was submitted to Judge Freedman. That matter was still undecided on June 16, 2003, 90 days after submission. Attorneys in the Slauson matter e-mailed Judge Freedman about the delay in ruling on October 16, 2003, and he responded on the following day, October 17, 2003. The attorneys wrote again to request a ruling on December 15, 2003, and again on February 11, 2004. Though the evidence is equivocal whether and when Judge Freedman received the letters sent in December and February, we find based on his testimony that he personally responded to the attorney’s e-mail in October 2003, and responded again to an e-mail followup on April 7, 2004, promising a ruling in the matter as soon as possible. We find, as did the masters,[7] that at least in early October 2003, and again in April 2004, the evidence clearly and convincingly shows Judge Freedman had been reminded his ruling in the second Slauson matter was overdue. The matter remained undecided until October 13, 2004, 485 days overdue.
2. Count IK (Nwokoro). On July 2, 2003, Judge Freedman took a matter in the Nwokoro case under submission. Judge Freedman did not decide the matter until September 7, 2004, 343 days overdue.
3. Count 1L (Morgan-Lincoln). On September 11, 2003, Judge Freedman took a matter in the Morgan-Lincoln case under submission. Judge Freedman decided the matter on August 22, 2004, 256 days overdue.
4. Count 1M (Levy). On November 25, 2003, Judge Freedman took a matter in the Levy case under submission. He did not decide it until November 3, 2004, 254 days overdue.
5. Count IN (Mar/Dan). On December 16, 2003, Judge Freedman took a matter in the Mar/Dan case under submission. Judge Freedman did not decide the matter until August 26, 2004, 164 days overdue.
6. Count 10 (Bell). On December 22, 2003, following a court trial, the Bell case was submitted to Judge Freedman for decision. The matter was not
*CJP Supp. 237 decided by March 21, 2004, 90 days after submission. In April 2004, one of the parties, Beasley, wrote to Judge Freedman to request a ruling. Beasley wrote again about the ruling on May 3, 2004, and again on July 1, 2004. The evidence does not clearly and convincingly establish that Judge Freedman actually received or saw the letters sent before July 2004, but we find, based on Judge Freedman’s admissions, that he received and reviewed Beasley’s July 1, 2004 letter. Beasley also telephoned Judge Freedman’s clerk several times to express frustration with the delay. Judge Freedman was aware from some of these communications that the case had been pending for a long period of time. Judge Freedman decided the matter on July 2, 2004, 194 days after submission, and one day after receiving Beasley’s letter of July 1.
7. Count IP {Kassojf). In the Kassojf cast, Judge Freedman heard a matter and it was submitted to him for decision on January 8, 2004. He had not decided it by April 7, 2004, the 90th day after submission. The masters did not address the point in their report, but we find based on Judge Freedman’s testimony and the documentary record that on June 6, 2004, one of the attorneys in the matter wrote to Judge Freedman about the status of the matter. The record does not establish when Judge Freedman saw the letter, but the evidence establishes he was aware of the matter by July 31, 2004, when he directed his clerk to set a hearing for August 2004, and to inform counsel that he expected to rule in August 2004. Judge Freedman decided the matter on August 31, 2004, 146 days overdue.
8. Count IQ (Weaver). In the Weaver case, a matter was submitted to Judge Freedman for decision on March 16, 2004. Judge Freedman did not decide the matter until September 9, 2004, 87 days overdue.
9. Count 1R {Natnat). On March 17, 2004, a matter in the Natnat case was submitted to Judge Freedman. The 90th day after submission passed on June 15, 2004. At the hearing before the special masters, Judge Freedman testified he began work on the matter around August 11, 2004, when a second copy of briefing by one of the parties was filed at the court’s request. Judge Freedman decided the matter on August 24, 2004, 70 days overdue.
10. Count IS {Tibbs). On May 6, 2004, Judge Freedman heard a matter in the Tibbs case, and it was submitted to him for decision. He did not decide it until August 30, 2004, 26 days overdue.
11. Count IT {Caswell). In the Caswell case, a matter was submitted to Judge Freedman for decision on May 18, 2004. He did not decide it until September 7, 2004, 20 days overdue.
12. Count 1U {Teixiera). On June 2, 2004, Judge Freedman heard a matter and it was submitted in the Teixiera case. He decided it on September 7, 2004, 7 days overdue.
*CJP Supp. 238 In mid-to-late August 2004, then Presiding Judge Barbara Miller asked the lead research attorney to check the court’s computerized docket and report to her on any cases that were under submission to the court’s judges for more than 90 days. Judge Miller learned from the report she received that Judge Freedman had a number of overdue matters. On August 23, 2004, Judge Miller met with Judge Freedman and delivered a letter to him instructing him to decide the overdue matters and relieving him of his duties as supervising judge. The masters found Judge Freedman was contrite and apologetic at the meeting. Judge Miller also instructed Judge Freedman in the letter that if he did not self-report the delays to this commission, Judge Miller would make a report.
As we find, and the master’s findings demonstrate, Judge Miller’s warnings and instructions resulted in decisions in most of the delayed cases. Between the end of August 2004 and early November 2004, Judge Freedman decided all his overdue cases. On September 15, 2004, he self-reported to the commission, as requested by Judge Miller. Since then, Judge Freedman has not allowed any submitted matter to remain undecided for over 90 days.
Reasons for Delays
The reasons for Judge Freedman’s decisional delays varied. The masters found that Judge Freedman simply failed to keep track of some of the charged matters, although the masters did not identify those matters. However, based on Judge Freedman’s testimony, we find that he failed to keep track of the Alameda (count 1A), CSK (count ID), Nwokoro (count IK), Morgan-Lincoln (count 1L), Levy (count 1M), Mar/Dan (count IN), Weaver (count IQ), Natnat (count 1R), and Tibbs (count IS) matters. We also find that before August 2004, despite the warnings by Judge McKinstry in 2001 and Judge Sheppard in late 2002, Judge Freedman failed to implement any meaningful tracking system to ensure he was aware of matters that he had under submission. He also failed to take advantage of the court’s computerized case management system, DOMAIN,[8] a system with which he was very familiar and which was capable of generating a list of submitted matters that might have alerted him to his overdue matters. Apart from some testimony *CJP Supp. 239 that the system was occasionally unreliable, no cogent explanation was offered why Judge Freedman did not effectively use this system to track his cases.
In other instances of delay charged in count 1, the delays were fostered at least in part by Judge Freedman’s erroneous belief that some matters were not submitted to him until certain tasks he alone had in mind were performed. Under the rules of court, a matter is submitted when either of the following first occurs: (1) the court orders it submitted, or (2) the date a final paper is filed or argument is heard, whichever is later. (Cal. Rules of Court, rule 2.900 [former rule 825].) The masters identify one such matter, Bellamy (count 1C), in which Judge Freedman ordered the matter taken under submission at the hearing on the matter, but which he believed would not be truly under submission until he had completed additional unspecified post-hearing tasks. Based on Judge Freedman’s testimony, it appears in addition that Judge Freedman erroneously believed that the Contra Costa (count IF), BART (count 1G), Slauson (count 1H), Willard (count 1J), and Natnat (count 1R) matters were not submitted to him on the submission dates found by the masters. The masters considered and rejected Judge Freedman’s explanation of his understanding of the dates of submission, and we adopt their findings.
The masters also found that in some instances, Judge Freedman knew the delayed matters had been pending for long periods of time, but simply failed to act on them within 90 days of submission. The masters identified the Bell (count 10) and Slauson (count 1H [second delay]) matters as instances in which Judge Freedman was reminded at some point by counsel or parties that the matters were pending, but still failed to act on them. We adopt those findings, and based on our own review of evidence, also include Kassoff (count IP) in this category.
Judge Freedman explained that in some instances his other commitments interfered with his ability to decide pending matters. It is undisputed in these proceedings that Judge Freedman was an active participant in numerous voluntary administrative activities with both the Alameda County Superior Court and the statewide Judicial Council. He was chair of the superior court’s Information Technology Committee, a member of the Judicial Council’s Civil and Small Claims Advisory Committee, the co-chair of a statewide group working on rules for temporary judges, and participated in other activities that took him away from his regularly assigned courtroom duties. While these activities may be laudable in the abstract, they do not excuse or mitigate his failure to attend to his first duty, to resolve the matters brought before him for judicial decision. (See Cal. Code Jud. Ethics, canon 3A [judicial duties prescribed by law to take precedence over all other matters]; id., canon 3B(1) [judges to hear and decide all matters assigned to them].) To the extent *CJP Supp. 240 Judge Freedman was distracted from his duty by these activities after he had been chastised by Judge McKinstry, they tend to aggravate rather than mitigate his misconduct.
In sum, we find that Judge Freedman failed to timely decide matters pending before him in 21 of the 23 instances charged in count 1 of the Notice. We also find that after 2001, despite warnings and offers of assistance from Presiding Judge McKinstry in 2001, and further warnings from Presiding Judge Sheppard in 2003, Judge Freedman failed to take appropriate action to monitor and track his caseload to avoid additional delay, and failed to adjust his workload in ways that could have helped him timely resolve the matters he had under submission.
B. Count 1—Conclusions of Law
We conclude, as the masters did, that Judge Freedman’s persistent and repeated failure over a four-year period to decide the matters charged and proved in count 1 within 90 days of submission was prejudicial misconduct. We adopt the masters’ conclusions that Judge Freedman’s delays violated canons 3A and 3B(8) of the California Code of Judicial Ethics. Canon 3A provides the “judicial duties prescribed by law shall take precedence over all other activities of every judge.” Canon 3B(8) requires that “[a] judge shall dispose of all judicial matters fairly, promptly, and efficiently.”
In addition, we conclude independently that Judge Freedman’s conduct violated canons 1 and 2A of the California Code of Judicial Ethics as well. Canon 1 requires judges to “participate in establishing, maintaining, and enforcing high standards of conduct,” and requires they “personally observe those standards so that the integrity and independence of the judiciary will be preserved.” Canon 1 is intended in part to preserve public confidence in the judiciary, and violations of the Code of Judicial Ethics “diminish public confidence in the judiciary and thereby do injury to the system of government under law.” (Advisory Com. com., 23 pt. 4 West’s Ann. Cal. Codes, Court Rules (2006) foil, canon 1, p. 341.) Canon 2A provides that a judge shall “respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.” Judge Freedman’s persistent and unjustified failure to rule in numerous cases, sometimes for long periods of time and after he had been counseled about excessive delay by two presiding judges, fell well below the high standards of conduct expected of the judiciary, and injured public confidence in the judiciary.
The evidence amply supports the masters’ conclusion that Judge Freedman’s persistent, unjustified, and repeated failure to decide the matters *CJP Supp. 241 submitted to him as charged in count 1 constitutes prejudicial misconduct. It is established that substantial and persistent failure to rule on submitted matters without substantial justification “may well cause criticism and bring the judicial office into disrepute.” (Mardikian, supra, 40 Cal.3d at pp. 482, 485; see also In re Creede (1986) 42 Cal.3d 1098, 1099 [233 Cal.Rptr. 1, 729 P.2d 79]; In re McCullough (1987) 43 Cal.3d 534, 535 [236 Cal.Rptr. 151, 734 P.2d 987].) In several of the delayed cases, litigants directly pointed out to Judge Freedman that the delays were actually or potentially harming their interests, and requested decisions. Judges are employed by the state to decide cases; when they fail to do so without substantial justification, their failure tends to cast the judicial office into disrepute and to lower public esteem for the judiciary. We adopt the masters’ conclusion that the 21 decisional delays charged and proven in count 1 were prejudicial misconduct.
C. Count 2—Findings of Fact
In count 2, Judge Freedman was charged with submitting an unspecified number of false salary affidavits at unspecified times during the periods June 2000 to April 2001, August 2002 to February 2003, June 2003 to August 2004, and October 2004. The periods in which Judge Freedman is charged with submitting false affidavits correspond to the times the matters charged in count 1 were delayed. As noted, the findings on the two counts overlap.
The masters found, as do we, that Judge Freedman regularly signed and submitted false salary affidavits during the three periods of delay alleged and proven in count 1. This finding is based on Judge Freedman’s testimony he regularly signed and submitted monthly state and biweekly county affidavits during the three periods of delay alleged and proven in count 1.
In view of the broad language of the Notice, it is arguable these findings are sufficient to sustain the charge and the master’s conclusion that Judge Freedman committed prejudicial misconduct. However, because we believe these findings alone are insufficient to explain the result we reach in this case, we find the following facts were also established by clear and convincing evidence.
Alameda County judges receive salary payments in part from both the State of California and Alameda County (county). The county makes salary payments every two weeks, the state once a month. To get paid by the county, Judge Freedman had to submit salary affidavit forms to the county (the county affidavits). The county affidavit form stated that the signer had no “causes” then pending that had been under submission for more than 90 days. Judge Freedman typically received the county affidavit forms for signature a few days before the end of the pay period they covered, and signed them on *CJP Supp. 242 the same day they were presented to him, near the end of the pay period. The county affidavit form provided blanks in which the signer was to enter the ending date of the subject pay period and the date of signature. The form stated that the form was required to be completed pursuant to the constitutional and statutory provisions requiring judges to decide submitted matters within 90 days or forgo their salaries. However, the county form did not include any statement that the declaration was made under penalty of perjury or other form of affirmation that the content of the document was true.
The state affidavit form required the judge to declare under penalty of perjury that “no cause remains pending and undetermined that has been submitted to me in said court for decision for the period of ninety days prior to the first day of_, (year).” Judge Freedman typically postdated the form, that is, he filled in the blank for the ending date of the period with a date about 30 days after the affidavit was signed. For example, in a state salary affidavit he signed around August 1, 2004 (a time when he had numerous delayed cases), Judge Freedman attested under penalty of perjury that “no cause remains pending and undetermined that has been submitted to me in said court for decision for the period of ninety days prior to the first day of September 1, 2004.”
We find there is clear and convincing evidence that at specific points, Judge Freedman was aware from contemporaneous reminders and requests that he had delayed matters pending, and during those times, continued to execute state and county salary affidavits. In connection with count one, we found that Judge Freedman knew he had delayed matters pending for periods of time in Bell, Slauson (second delay), and Kassoff, based on reminders from counsel or parties. We further find he continued to sign salary affidavits during those periods of time. In addition, we find Judge Freedman signed salary affidavits at times he was aware of overdue matters in Alameda, Slauson (first delay), O’Toole, and Willard. In each of those matters, he signed at least one salary affidavit after being informed of the overdue matter by the presiding judge and before deciding the matter.
There is clear and convincing evidence that Judge McKinstry told Judge Freedman in mid-March 2001 of the delay in the Alameda matter, and gave him a list of overdue matters that included the Alameda matter. That matter was not resolved until April 16, 2001. Based on this evidence, we find Judge Freedman knew the Alameda matter was delayed from mid-March 2001 until he decided it on April 16, 2001. Judge Freedman nonetheless submitted a state salary affidavit dated March 30, 2001, and county affidavits shortly before March 31, 2001, and again shortly before April 14, 2001.
There is also clear and convincing evidence Judge Freedman executed false salary affidavits when he was aware he had delayed matters in the Slauson *CJP Supp. 243 (first delay), O’Toole, and Willard cases. Presiding Judge Sheppard informed Judge Freedman no later than January 4, 2003, that these matters were delayed. Judge Freedman signed a state affidavit within a few days of January 7, 2003. Willard was decided on January 15, 2003. Shortly before January 17, 2003, Judge Freedman signed a county affidavit. The Slauson and O’Toole matters were not decided until January 31, 2003, and February 7, 2003, respectively.
Notwithstanding clear and convincing evidence that Judge Freedman executed salary affidavits when he was aware that he had delayed matters pending, a question remains whether Judge Freedman was consciously aware he was making false statements at the moment he signed the affidavit. The masters accepted Judge Freedman’s testimony that he was not consciously aware of the delayed matters when he signed the affidavits. We are troubled by this finding, and based on the cold record of the transcript of the hearing, we probably would not agree with it. However, the special masters appointed by the Supreme Court are experienced jurists, who had the advantage of seeing and hearing Judge Freedman testify. While this commission retains the authority to override the factual findings of the special masters, even on matters of credibility of witness testimony, we are mindful that the credibility findings of the masters may be given “special weight” where they are based on the masters’ observations of the witnesses’ demeanor at a hearing. (See, e.g., Broadman, supra, 18 Cal.4th at p. 1090.) As we discuss next, though, Judge Freedman’s testimony shows a disconnect in his thinking that impels our conclusion he committed willful misconduct in those instances when there is clear and convincing evidence he had been informed of delayed matters prior to signing salary affidavits.
D. Count 2—Conclusions of Law
The masters concluded Judge Freedman’s falsification of salary affidavits during the subject time periods violated canons 1 and 2A of the California Code of Judicial Ethics, and was prejudicial misconduct. They reasoned that because Judge Freedman was not thinking about whether he had overdue cases when he signed salary affidavits, and signed in a “rote, unthinking way,” the evidence did not show “actual malice or that he acted recklessly or with utter indifference to the accuracy of the statements. . . .” The masters concluded that, at worst, Judge Freedman “should have known that the statements he was signing were inaccurate”; accordingly, under Broadman, such “mere negligence” could not be willful misconduct. (See Broadman, supra, 18 Cal.4th at p. 1092 [willful misconduct connotes something more than that the judge “should have known” better; “mere negligence” can never be willful misconduct].) The masters concluded there was a pervasive pattern of repeated prejudicial misconduct, regardless of the judge’s state of mind.
*CJP Supp. 244 We agree with the masters’ conclusions except as to those specific instances in which we find that Judge Freedman executed salary affidavits at times when he was aware he had delayed matters. In those instances, we conclude he committed willful, not prejudicial, misconduct by signing the affidavits. Judge Freedman acknowledged that in some instances he continued to sign salary affidavits after being informed that a matter was delayed. He testified he was not thinking about those matters at the time he signed the affidavits, which, he executed “by rote,” “without thinking,” and without “connecting] the dots” between the “time status” of his matters and the “process of signing salary affidavits.” The masters relied on this testimony for their finding that Judge Freedman was not “consciously aware” of his delayed matters when he was signing salary affidavits. We conclude that this testimony establishes that Judge Freedman acted with utter indifference to whether the affidavits he executed were true or false.
In Broadman, the Supreme Court established that willful misconduct occurs not only when a judge, acting in a judicial capacity, intentionally acts unjudicially with a “corrupt purpose,” but also when a judge acts with “reckless or utter indifference to whether judicial acts being performed exceed the bounds of the judge’s prescribed power.” {Broadman, supra, 18 Cal.4th at p. 1092.) Though the discussion in Broadman occurred in the context of an abuse of judicial authority, the principle expressed (that a reckless disregard of the law is equivalent to an intentional disregard of the law) applies with equal force to this situation, in which a judge has recklessly submitted false salary affidavits. Applying that principle, we conclude that Judge Freedman’s utter disregard for the truth or falsity of salary affidavits he signed when he knew he had delayed matters pending satisfies the “bad faith” element of willful misconduct.[9]
Judge Freedman does not disagree that the submission of a false salary affidavit is prejudicial misconduct. He nonetheless argues count 2 was not proven, because there is no evidence he submitted any false “state and county salary affidavits,” as charged in the Notice. We agree with the masters that this contention is without merit.
As to the county affidavits, Judge Freedman argues the charge was not proven because he did not execute the county affidavits under penalty of perjury, and therefore the documents cannot be “affidavits,” as that term is defined by law and charged in the Notice. It is true the county form requires the signer to “declare” he or she has no cases under submission and pending for more than 90 days, but does not require any oath of any kind that the *CJP Supp. 245 declaration is true.[10] We nonetheless emphatically reject this technical objection to the language of the Notice. The term “salary affidavit” is used in the Notice, and is in common usage among judges. It refers to the statements judges sign to get their salaries. It is a statement made in a judge’s official capacity for the express purpose, stated by the document itself, of complying with the judicial salary provisions of the Constitution and the Government Code. Whether or not the statement is made under penalty of perjury, it is clearly and obviously unjudicial to falsify it. Moreover, Judge Freedman admitted in his answer that he had “executed state and county salary affidavits.”
We also reject Judge Freedman’s argument that the state affidavits were not proven to be “false.” The state form requires the judge to declare under penalty of perjury: “no cause remains pending and undetermined that has been submitted to me in said court for decision for the period of ninety days prior to the first day of_, (year).” Judge Freedman typically postdated the document to a date about 30 days after the affidavit was signed. Based on his practice of postdating the affidavits, Judge Freedman argues the examiner failed to prove his state affidavits were “false” because it is technically impossible to swear to the truth of a future state of events. This argument is without merit.
The Constitution prohibits a judge from being paid when the judge has delayed matters. If accepted, Judge Freedman’s claim would mean a judge who has matters that are actually overdue could truthfully execute a state affidavit and obtain salary based on an unenforceable promise that the judge would be in compliance with the law by the time the affidavit was effective. The argument also implies that by making that promise successively, the same judge could continue to execute similar affidavits (and receive salary) indefinitely, without ever clearing his or her backlog of delayed cases. That position is both patently specious and contrary to the clear intent of the Constitution that judges who have overdue matters are not to be paid their salaries until they have decided them. (See, e.g., Meyers v. Kenfield (1881) 62 Cal. 512, 513-514 [construing Cal. Const., art. VI, former § 24].) Moreover, it is contrary to the general understanding among judges of the salary affidavit procedure. (See Rothman, Cal. Jud. Conduct Handbook, supra, § 6.19, p. 168 [advising judges that if they discover they have a case over 90 days, they must have submitted at least one false affidavit, and must not submit another until the case is decided].)
*CJP Supp. 246 A judge who executes a salary affidavit affirming he or she has no overdue rulings should take care to ensure that the statement is true when it is made. There is no question Judge Freedman knew the law, for he signed the state and county affidavits for the express purpose of receiving his salary. It is unjudicial and damaging to the public esteem for judicial office for a judge to submit false statements to obtain salary to which the judge is not then entitled. We therefore reject Judge Freedman’s technical arguments based on the form of his affidavits.
E. Count 3—Findings of Fact
The Notice charged in count 3 that in early 2004, Judge Freedman failed to rule timely on “over 200” fee waiver applications submitted by litigants in civil and family law matters in the Hayward branch of the Alameda County Superior Court. The Notice charged that as a result, in February 2005, the court refunded $9,984 in fees to litigants whose applications had been denied too late. The conduct alleged in count 3 is charged as violating canons 1, 2A, 3A and 3B(8) of the California Code of Judicial Ethics.
“Fee waiver applications” are applications by litigants to proceed with their court cases without paying the filing and other fees that are ordinarily charged by the superior courts. The procedure for proceeding in superior court without paying filing or other fees is provided for by the Government Code and the California Rules of Court. (Gov. Code, § 68511.3; Cal. Rules of Court, rule 3.50 et seq. [former rule 985].) The rule that applied in 2003 was former rule 985. Under that rule, a litigant who wanted to proceed without paying court fees had to file a standard Judicial Council application form. (Former rule 985(a).) The rule allowed the superior court to delegate the function of reviewing and granting the applications to the “court clerk,” but only a judge could deny them. (Former rule 985(d).) In either case, if the judge or the clerk failed to rule on the application within five days of filing, the application was granted automatically. (Former rule 985(e).)
The masters found that Judge Freedman had failed to act in a timely fashion on “approximately 200 fee waiver applications.” The finding was based on undisputed evidence that Judge Freedman had personally taken over the handling of fee waiver applications when he was assigned to be the supervising judge in Hayward in November 2003. He fell behind, and a “substantial number” of applications were denied after the five days for a ruling had elapsed. There were complaints from litigants, and Presiding Judge Miller ordered a refund to the litigants whose applications were denied late. More than $9,000 was refunded pursuant to the order. These findings were supported by Judge Freedman’s testimony before the masters. Finally, it was *CJP Supp. 247 uncontradicted the late denials caused “irate” litigants to complain, and that the complaints caused Presiding Judge Miller to order fee refunds. We adopt the masters’ findings.
F. Count 3—Conclusions of Law
Based on their findings of fact, the masters concluded Judge Freedman’s conduct violated canons 3A (judicial duties to take precedence over other matters) and 3B(8) (judge to dispose of matters promptly) of the California Code of Judicial Ethics. We agree, and also find violations of canons 1 (independence and integrity of judiciary) and 2A (judges to respect and comply with the law so as to promote public confidence), for the same reasons we found violations of the same canons in connection with the delayed matters charged in count 1. (See pt. n.B. of the Discussion, ante, p. 240.) The number of applications that were improperly denied as the result of Judge Freedman’s failure to act, combined with the adverse effect of the improper denials on the litigants and on the public’s perception of the court, is enough to establish that Judge Freedman’s actions were violations of his duty to follow the law and perform his judicial duties competently (canon 2A), and also would tend to adversely affect the public perception of the integrity of the judiciary (canon 1).
The masters also concluded Judge Freedman had committed prejudicial misconduct, because his conduct was “prejudicial to the public’s esteem for the judicial office.” We agree, and adopt the masters’ conclusion. Judge Freedman’s conduct was unjudicial because he (1) failed to mle timely on a substantial number of applications after taking responsibility to do so, and (2) even though the rules provided applications were to be automatically granted if they were not acted on within five days of filing, applications that Judge Freedman had not acted on timely were nonetheless denied. Superior court fees are a significant burden, especially to individual litigants of limited means. Such fees are also a significant source of revenue for the courts. An objective observer would tend to hold the judiciary in lower esteem if informed that a supervising judge of the superior court failed to act on over 200 applications for fee waivers, with the result those applications were automatically granted whether meritorious or not. Moreover, the same observer would have the same reaction upon learning the court had failed to follow the law, and had denied the applications even though the judge’s inaction and the law required the court to grant them.[11]
*CJP Supp. 248 III.
DISCIPLINE
A. Introduction
We turn now to the most difficult and individualized part of our decision, the determination of the discipline most appropriate to the facts and circumstances of the case before us. As we explain below, we find Judge Freedman has committed egregious and persistent misconduct which would warrant removal if considered alone. However, we have also considered Judge Freedman’s otherwise exemplary performance as a jurist, the high esteem in which he is held by his peers and attorneys who appear before him, his acknowledgement of wrongdoing and acceptance of responsibility for his actions, and our perception that he is unlikely to offend again. Based on all the circumstances of this unusual case, we have determined to impose a severe public censure.
B. Analysis
The commission has identified various factors that may be relevant when determining what discipline is appropriate in a given case. The factors are (1) the number of acts of misconduct; (2) the existence of prior discipline; (3) whether the judge appreciates the inappropriateness of his or her conduct; (4) the judge’s integrity; (5) the likelihood of future misconduct; and (6) the impact of the misconduct on the judicial system. (Inquiry Concerning Ross (2005) No. 174, Decision and Order Removing Judge Ross from Office, pp. 63-64 [49 Cal.4th CJP Supp. 79, 137-138]; Inquiry Concerning Van Voorhis (2003) No. 165, Decision and Order Removing Judge Van Voorhis from Office, p. 31 [48 Cal.4th CJP Supp. 257, 295].) In the discussion that follows, we discuss each of the elements in turn, after which we review the decisions of the Supreme Court and this commission in cases that have involved allegations that judges unreasonably delayed their rulings and executed false salary affidavits.
1. Number of Acts of Misconduct.
The number of acts of misconduct is relevant to discipline to the extent it shows isolated incidents, or a pattern of misbehavior that demonstrates that the judge lacks judicial temperament and the “ ‘ “ability to perform judicial functions in an even-handed manner.” ’ ” (Fletcher v. Commission on Judicial Performance (1998) 19 Cal.4th 865, 918 [81 Cal.Rptr.2d 58, 968 P.2d 958] [pervasiveness of misconduct over the judge’s entire career demonstrated unfitness for office].) We have found numerous *CJP Supp. 249 instances of prejudicial and willful misconduct. Judge Freedman delayed rulings in 21 instances between 2001 and 2004, even after warnings from successive presiding judges. During that time, Judge Freedman rarely if ever stopped regularly executing salary affidavits. The pattern of wrongdoing is further exacerbated by the judge’s widespread failure to rule on fee waiver applications. This pattern of disturbing and pervasive misconduct warrants severe discipline.
2. Prior Discipline.
Judge Freedman was issued an advisory letter in 1998 for failing to timely substitute out of a matter as counsel before he was appointed to the bench. There is no other evidence of prior discipline by the commission. We attribute little significance to this prior discipline. It came early in Judge Freedman’s career as a judge, the misconduct involved was not of the same kind or gravity as the misconduct presented here, and it does not have direct bearing on Judge Freedman’s fitness to continue to serve on the bench. (Cf., e.g., Inquiry Concerning Velasquez (2007) No. 180, Decision and Order Removing Judge Velasquez from Office, p. 44 [49 Cal.4th CJP Supp. 175, 216] [finding public censure inadequate remedy for current misconduct in view of judge’s record of prior serious discipline, including previous public censure].)
Despite Judge Freedman’s lack of prior relevant discipline, it is significant that before this proceeding began, Judge Freedman had been counseled by presiding judges about delayed matters and nonetheless twice allowed the problem to recur. He was specifically warned in writing in 2001 by Judge McKinstry of his duty to submit truthful salary affidavits, but continued to execute affidavits “without thinking.” (Cf. Inquiry Concerning Van Voorhis, supra, No. 165, at pp. 38-39 [48 Cal.4th CJP Supp. at pp. 303-304] [judge had been counseled by presiding judge regarding his demeanor, but then resumed the same or similar misconduct within several weeks].)
3. Whether the Judge Appreciates the Inappropriateness of His Conduct.
A judge’s lack of appreciation of misconduct and failure to recognize and admit impropriety are indications that a judge lacks the capacity to reform. (See, e.g., Inquiry Concerning Velasquez, supra, No. 180, at p. 45 [49 Cal.4th CJP Supp. at p. 218].) Judge Freedman’s testimony indicates he understands the nature of his wrongdoing, and recognizes its impropriety. He testified he should have kept track of his cases and should have considered whether he had overdue cases when he signed salary affidavits, but did not do either. In addition, the evidence shows Judge Freedman worked to eliminate his delayed cases when they were brought to his attention in 2001, 2003 and *CJP Supp. 250 2004, and expressed regret for his conduct in his interview with Judge Miller in 2004. Judge Freedman admitted most but not all of the charges against him. We believe Judge Freedman appreciates the nature and extent of the misconduct, and has acknowledged the errors he has committed.
4. The Judge’s Integrity.
The masters found, as do we, that “[i]t is clear Judge Freedman is respected as a thoughtful, intelligent, compassionate, and hard-working jurist.” That finding is supported by the testimony of numerous judges and attorneys, including Judges Sheppard, Miller, and Hernandez, all of whom served as presiding judges over Judge Freedman and who testified to his good character, industry, and value to the bench.
The substance of the testimony of the two former presiding judges and the present presiding judge of the superior court in which Judge Freedman sits has significant persuasive value. Judge Hernandez, the current presiding judge, testified to his complete confidence in Judge Freedman. Judge Sheppard testified to Judge Freedman’s contributions to the superior court bench, to his work ethic, and to his extraordinary competence as a judge. Judge Miller testified to his contributions to the court, her “enormous” respect for his judgment, and his productive work for the court. Numerous attorneys, including nine who were counsel in delayed matters, testified or submitted declarations in support of Judge Freedman. Attorneys described him as “intelligent and thoughtful,” “respectful and fair,” “hardworking,” and “an excellent judge.”
Apart from the misconduct charged in this matter, there is no evidence that Judge Freedman lacks integrity, and there is strong evidence of his good qualities as a trial court judge. The esteem of his peers and his overall competence, work ethic, and superior ability, suggest that he is capable of reform, and that his removal from office is not necessary to protect the public. (See Doan v. Commission on Judicial Performance, supra, 11 Cal.4th at p. 314; Kennick v. Commission on Judicial Performance (1990) 50 Cal.3d 297, 341 [267 Cal.Rptr. 293, 787 P.2d 591].)
5. Likelihood of Future Misconduct.
The evidence supports the conclusion that Judge Freedman is not likely to commit misconduct in the future. His testimony before the special masters and his remarks to this commission in argument indicate that he now understands how serious his misconduct was. He admitted most of the charges almost entirely. When he explained his conduct, he acknowledged that his reasons for acting as he did were incorrect or based on an incorrect *CJP Supp. 251 view of the law. Since 2004, Judge Freedman has been entrusted with significant new judicial responsibility, and no further misconduct has occurred. The evidence strongly establishes his value as a public servant. In our view Judge Freedman does not pose an ongoing threat to the public.
6. Impact on the Judicial System.
Judge Freedman’s misconduct is grave, and has had an obvious and palpable adverse impact on the public’s perception of the integrity of the judiciary and on the administration of justice. We believe an objective observer would be shocked and angered that Judge Freedman repeatedly signed salary affidavits without thinking, “by rote,” and with reckless disregard for the truth of the statements he was making. Moreover, his numerous and sometimes lengthy decisional delays harmed individual litigants and had an adverse impact on the administration of justice in Alameda County.

History of Public and Private Discipline in Cases Involving Delay and False Salary Affidavits.

Judge Freedman urges that removal from office in this case would be a significant departure from the treatment of misconduct of similar character in prior discipline cases. As he points out, in these past cases, on the varying facts presented, neither the Supreme Court nor this commission has found the misconduct so egregious as to warrant removal from office.
For example, in In re McCullough, supra, 43 Cal.3d at page 535, the Supreme Court considered a recommendation by this commission for censure based on the judge’s failure to timely decide cases. Judge McCullough failed to timely decide “a case submitted to his court for a period of three years, nine months,” despite repeated reminders from the parties and three private admonishments from this commission. {Ibid.) He also “continued to execute salary affidavits and to receive his salary even though submitted cases remained pending and undecided in his court for periods in excess of 90 days.” {Ibid.) The Supreme Court agreed with the commission’s conclusion that Judge McCullough’s “failure to promptly decide cases, despite private admonishments and inquiries from the commission and the parties, and his disregard of California law in executing salary affidavits and in receiving his salary, was ‘conduct prejudicial to the administration of justice that brings the judicial office into disrepute.’ ” {Ibid.) The Supreme Court adopted the commission’s recommendation for censure without further comment on the facts.
Other Supreme Court cases have reached similar results on similar facts. (See Mardikian, supra, 40 Cal.3d at pp. 478-479 [hardworking and overworked judge had numerous significant and unjustified delays and submitted *CJP Supp. 252 salary affidavits during periods of delay up to a year, despite repeated communications with this commission about delayed matters; censured for prejudicial misconduct]; In re Jensen (1978) 24 Cal.3d 72, 73 [154 Cal.Rptr. 503, 593 P.2d 200] [judge who unjustifiably delayed rulings and “nevertheless” submitted salary affidavits that inaccurately said he did not was censured]; In re Creede, supra, 42 Cal.3d at p. 1099 [judge censured for delays over a five-year period and execution of “erroneous” salary affidavits, with a finding that the judge did not knowingly falsify the affidavits].)
The commission’s public disciplinary decisions are similar. For example, in 1998, we publicly admonished a judge for seven-month and 13-month delays in two civil matters.* (Public Admonishment of Judge Robert H. Oliver (1998).) The admonishment noted that Judge Oliver also had executed sworn salary declarations stating he had no delayed cases during the periods of the delayed matters, some after he received reminders that one of the cases was overdue. In 1995, a judge stipulated to a public reproval for delaying cases, and the commission noted in its public statement that the judge had continued to execute salary affidavits during a period of delay of over a year. (Public Reproval of Judge Thomas Breen (1995).)
Judge Freedman contends we should not remove him from office because no other judge has yet been removed for the same or similar misconduct. We emphatically reject that proposition and will not limit the scope of discipline to be imposed in future cases involving similar misconduct. (See, e.g., Broadman, supra, 18 Cal.4th at p. 1112 [proportionality review is “neither required nor determinative”].)
Our determination of the appropriate sanction to impose on Judge Freedman is not predetermined by prior decisions- in which judges were not removed from office for delay and falsification of salary affidavits, any more than it is appropriate for us to ignore all that has gone before. (See, e.g., Furey v. Commission on Judicial Performance (1987) 43 Cal.3d 1297, 1318 [240 Cal.Rptr. 859, 743 P.2d 919] [though each case turns on its facts, it is “worth comparing” other judicial discipline cases]; see also, e.g., Inquiry Concerning Hall (2006) No. 175, Decision and Order Removing Judge Hall from Office, pp. 26-28 [49 Cal.4th CJP Supp. 146, 170-172] [reviewing precedent in consideration of discipline].) We consider those prior decisions as a factor in our ultimate decision to censure Judge Freedman.
*CJP Supp. 253 ORDER
Judge Freedman has committed serious misconduct that taken alone might warrant removal from office. However, he is a respected and talented jurist who was strongly supported in this proceeding by a significant number of attorneys and colleagues, including two former presiding judges and the present presiding judge of the court in which he sits. Two of those former presiding judges were called as witnesses by the examiner, and testified not only to their high opinion of Judge Freedman and their confidence in him, but to facts that support this decision to censure him. Counsel for parties in a number of the delayed matters supported Judge Freedman in these proceedings and testified that they would not hesitate to appear before him in future cases. Other than the subject misconduct, there was no evidence presented that called Judge Freedman’s abilities as a jurist or his suitability for the bench into question. Judge Freedman has not been the subject of any relevant prior discipline, he has acknowledged his wrongdoing and is contrite, and we are satisfied he is unlikely to offend again. For those reasons, and after careful consideration of the unique circumstances of this case, we have determined to issue this severe public censure of Judge Robert B. Freedman.
Commission members Hon. Frederick R Horn, Hon. Judith D. McConnell, Hon. Katherine Feinstein, Ms. Patricia Miller, Ms. Barbara Schraeger, and Mr. Lawrence Simi voted in favor of all the findings and conclusions expressed herein and in the foregoing order of severe public censure of Judge Freedman. Mr. Jose C. Miramontes voted for removal. Mr. Marshall B. Grossman and Mr. Michael A. Kahn did not participate. There are two vacancies on the commission.

 All further references to rules are to the Rules of the Commission on Judicial Performance, unless otherwise specified.

 Government Code section 68210 provides: “No judge of a court of record shall receive his salary unless he shall make and subscribe before an officer entitled to administer oaths, an affidavit stating that no cause before 'him remains pending and undetermined for 90 days after it has been submitted for decision.”

 We use the term “delayed matters” to refer to matters that were under submission to Judge Freedman but undecided for 90 days or more.

 We do not reproduce the full names and numbers of the cases in the text, because those details are not relevant to our discussion.

 The Notice charged two delayed matters in the Slauson case in count 1H, one occurring in this 2002-2003 period, and the second in the 2003-2004 period. The discussion in the text relates to the first delay.

 There was a second matter in Willard in which Judge Freedman was alleged to have delayed a ruling, but the masters found it was not proven. The parties do not object to the finding. We adopt it, and dismiss that part of count 1J.

 The masters identify the matter as the “second matter in the Willard case,” but their statement of the facts establishes they are actually referring to the second matter in the Slauson case.

 DOMAIN is a computerized case management system that includes document imaging of all filed documents in Alameda County Superior Court cases. The system allowed judges (and others) to view images of filed documents from their computers. Court files can be accessed by party names or case numbers. At least by August 2004, and probably in 2002 and 2003, the DOMAIN system could be used by an individual Alameda County judge to access a list of all cases that judge had under submission awaiting rulings and the dates on which rulings were due. Judge Hernandez, the current presiding judge, testified that Judge Freedman “was unique in his ability to understand the DOMAIN technology component and the civil component and serve as the person to blend all of that together.”

 There is no question the other elements of willful misconduct are satisfied. Making false official statements is clearly unjudicial. The duty to execute salary affidavits is part of the administrative duties of a judge, and is therefore done in a “judicial capacity.”

 Under the Code of Civil Procedure, an “affidavit” must be made “under oath” and must be taken before an officer authorized to administer oaths. (Code Civ. Proc., § 2003; see also Black’s Law Diet. (7th ed. 1999) p. 58 [“affidavit” is a statement “sworn to by the declarant before an officer authorized to administer oaths”].)

 For the reasons stated in the text, we reject Judge Freedman’s contention his conduct was at most improper action. Substantial and persistent failure to rule timely can be prejudicial misconduct, even though the delays do not cast doubt on the judge’s independence or integrity. (Mardikian, supra, 40 Cal.3d at p. 485.)

Reporter’s Note: The original decision incorrectly referred to the two delayed matters in the Public Admonishment of Judge Robert H. Oliver as civil cases. They were both criminal matters.